

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-18-2002

# Fogleman v. Mercy Hosp

Precedential or Non-Precedential:

Docket 0-2263

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Fogleman v. Mercy Hosp" (2002). *2002 Decisions.* Paper 184.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/184

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

       Filed March 18, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2263

GREGORY FOGLEMAN, Appellant

v.

MERCY HOSPITAL, INC.

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 98-cv-01746)
District Judge: Honorable James F. McClure, Jr.

Argued: July 10, 2001

Before: BECKER, Chief Judge, NYGAARD and REAVLEY,*
Circuit Judges.

(Filed: March 18, 2002)
_____

* Honorable Thomas M. Reavley, United States Circuit Judge for the
      Fifth Circuit, sitting by designation.

JAMES C. OSCHAL, ESQUIRE
 (ARGUED)
ELIZABETH C. LEO, ESQUIRE
Rosenn, Jenkins & Greenwald, LLP
15 South Franklin Street
Wilkes-Barre, PA 18711-0075

Counsel for Appellant Gregory
Fogleman

JAMES A. O'BRIEN, ESQUIRE
 (ARGUED)
Oliver, Price & Rhodes
1212 South Abington Road
P.O. Box 240
Clarks Summit, PA 18411

Counsel for Appellee Mercy Hospital,
Inc.

GWENDOLYN YOUNG REAMS,
 ESQUIRE
 Associate General Counsel
PHILIP B. SKLOVER, ESQUIRE
 Associate General Counsel
LORRAINE C. DAVIS, ESQUIRE
 Assistant General Counsel
ROBERT J. GREGORY, ESQUIRE
 (ARGUED)
 Senior Attorney
Equal Employment Opportunity
 Commission
Room 7032
1801 L Street, NW
Washington, D.C. 20507

Counsel for Amicus Curiae
Equal Employment Opportunity
Commission

2

OPINION OF THE COURT

BECKER, Chief Judge.

This employment discrimination action is presented as a modern rendition of the age-old parable of a son being punished for the sins of his father.[1] The father, Sterril Fogleman, had been an employee of defendant Mercy Hospital, Inc. ("Mercy") for seventeen years before leaving the hospital in 1993. In an action separate from this case, Sterril sued Mercy claiming that he had been forced out of his job due to age and disability discrimination. Sterril's son Greg Fogleman, who is the plaintiff in the case at bar, also worked for Mercy, being employed as a security guard for eighteen years before his termination in 1996. Although Mercy claims to have fired Greg for valid job-related reasons, Greg asserts that these reasons were pretextual, and that the real reasons for his firing relate to his father's legal action against Mercy.

Greg sued Mercy under the anti-retaliation provisions of three civil rights laws: the Americans with Disabilities Act ("ADA"), 42 U.S.C. SS 12101-12213; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. #8E8E # 621-634; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. SS 951-963, alleging three theories of illegal retaliation. Greg's first theory of illegal discrimination is that he was fired in retaliation for his father's having sued Mercy for disability and age discrimination. Second, Greg claims that Mercy violated the anti-discrimination laws by terminating him because it thought that he was assisting his father with his lawsuit (even if, in actuality, he was not). Third, Greg alleges that he was fired for refusing to cooperate with Mercy in the investigation of his father's claim. The District Court granted summary judgment to Mercy on all of Greg's claims, concluding that none of his

_____

1. See, e.g., Euripides, Phrixus, frag. 970 ("[T]he gods visit the sins of the fathers upon the children."); Horace, Odes III, 6:1 ("For the sins of your fathers you, though guiltless, must suffer."); William Shakespeare, The Merchant of Venice, act III, sc. 5, line 1 ("[T]he sins of the father are to be laid upon the children.").

theories of illegal retaliation were supported by the
language of the ADA, ADEA or PHRA.

In reviewing the District Court's grant of summary
judgment with respect to Greg's first claim, we are called
upon to determine whether the anti-retaliation provisions of
the ADA, ADEA, and PHRA prohibit an employer from
taking adverse employment action against a third party in
retaliation for another's protected activity. The ADA, ADEA,
and PHRA contain nearly identical anti-retaliation
provisions that prohibit discrimination against any
individual because "such individual" has engaged in
protected activity. 42 U.S.C. S 12203(a); 29 U.S.C. S 623(d);
43 Pa. Cons. Stat. S 955(d). Although we recognize that
allowing an employer to retaliate against a third party with
impunity can interfere with the overall purpose of the anti-
discrimination laws, we believe that by referring to"such
individual," the plain text of these statutes clearly prohibits
only retaliation against the actual person who engaged in
protected activity.

Unlike the ADEA and PHRA, however, the ADA contains
an additional anti-retaliation provision that makes it
unlawful for an employer "to coerce, intimidate, threaten, or
interfere with any individual" exercising rights protected
under the Act. 42 U.S.C. S 12203(b). We conclude that
under this provision, which contains language similar to
that of a section of the National Labor Relations Act
("NLRA"), 29 U.S.C. S 158(a)(1), that we have interpreted as
recognizing third-party retaliation claims, Greg's claim that
he was retaliated against for his father's protected activity
is valid as a matter of law, and we will therefore reverse the
grant of summary judgment.

We also believe that Greg's perception theory of illegal
retaliation -- that he was fired because Mercy thought that
he was engaged in protected activity, even if he actually
was not -- presents a valid legal claim. Because the
statutes forbid an employer's taking adverse action against
an employee for discriminatory reasons, it does not matter
whether the factual basis for the employer's discriminatory
animus was correct and that, so long as the employer's
specific intent was discriminatory, the retaliation is
actionable. Accordingly, we will reverse the Court's grant of

4

summary judgment on Greg's perception claim of retaliation. We discuss these first two theories in the text, infra. Greg's other theory of illegal retaliation -- that he was fired for refusing to cooperate with Mercy in the investigation of his father's claim -- is plainly without merit and we dispose of it in the margin.2

I. Facts and Procedural History

Members of the Fogleman family have a long history of employment at Mercy Hospital. The plaintiff, Greg Fogleman, began working for Mercy as a security officer in 1978. In 1992 Mercy named him Supervisor of Security, a post he held until his termination in 1996. Greg's wife, Michelle, also worked for Mercy for a few years in the late 1980s and early 1990s, and Greg's mother was an employee at Mercy until her retirement in May 1999. But the story of this litigation begins with Greg's father, Sterril Fogleman, who began working at Mercy in 1976 as an engineer and remained on the staff for 17 years, until 1993, when the hospital offered him a choice between accepting a demotion or leaving the hospital. Sterril chose to leave, and suspected that Mercy had pushed him out due to his advancing age and his recent loss of sight in one eye.

_____

2. Greg alleges that Mercy's Vice President for Support Services, Michael Elias, called him into his office at least six times to inquire about the state of Sterril's claim. In response to Elias's entreaties, Greg repeatedly responded that he had not discussed the case with his father, and that even if he had, he would not discuss the matter with Elias. While an employee's refusal to cooperate with management's investigation of a claim filed by another employee may constitute protected activity under the anti-discrimination laws, see 2 Employment Discrimination S 34.02[2] (Lex K. Larson ed., 2d ed. 2001), we do not think that Greg's remarks amounted to a refusal to cooperate. Greg's response that he "did not discuss" the case with his father indicated only that he had no information to provide the hospital. This is not a case, therefore, in which an employee refused to share knowledge of a fellow employee's claim with his employer. Although Greg claims to have also told Elias that even if he had discussed the claim with his father, he would not be willing to share the information, we consider this remark gratuitous in light of Greg's own admission that he had not broached the issue with his father.

5

In June 1995, after satisfying the administrative prerequisites, Sterril sued Mercy for illegal discrimination in the District Court for the Middle District of Pennsylvania. Just before trial was to begin, in July 1998, the parties settled and the case was dismissed. Greg asserts that he did not participate in any way in Sterril's complaints or lawsuit.

Shortly after Sterril filed his lawsuit in federal court, Martin Everhart, Mercy's Vice President of Human Resources, circulated a one-page memorandum to top Mercy officials offering a brief explanation of why, in the hospital's opinion, Sterril's claim was meritless. The memo acknowledged that commenting on Sterril's lawsuit during its pendency was "done at some risk as we continue to have relatives of Mr. Fogleman employed by Mercy and open ourselves up to further public exposure particularly through newspapers as this document may be shared that way." Greg submits that this language indicates that Mercy considered him a "risk" because of his father's lawsuit. He also asserts that Everhart was "a bit colder" to him after the circulation of this memo. As described in note 2, supra, Greg also avers that a representative of management-- namely, Michael Elias -- repeatedly questioned him about the status of his father's lawsuit in an attempt to pry information out of him to aid the hospital in its defense.

On September 6, 1996, Greg was involved in an incident at the hospital's gift shop that ultimately provided the official -- Greg claims pretextual -- basis for Mercy's termination of his employment. Greg claims that he used a spare key to enter the hospital gift shop that morning to check on the well-being of an elderly woman, Audrey Oeller, who worked there as a volunteer. Greg avers that his job description authorized him to enter the shop; additionally, his supervisor testified that before this incident Greg routinely entered the shop to check on Oeller.

The hospital, in contrast, asserts that Greg had no authority to enter the gift shop at any time, and that his entry was in violation of hospital rules. Moreover, the hospital represents that it was troubled by Oeller's conflicting account of Greg's reasons for entering the shop. According to Oeller, Greg told her that he entered the shop

6

to check on the sprinkler system at the request of maintenance supervisor Dave Searfoss. Searfoss, however, related to the hospital that he had never made any such request of Greg. According to Mercy, Greg also violated hospital policy by failing to report the incident to anyone until questioned about it, failing to request assistance, failing to document the incident until directed to do so, and failing to report the taking of the key to the gift shop from a secure Maintenance Department Room.

On September 11, the hospital suspended Greg with pay in the wake of the gift shop incident pending further investigation. Greg claims that he was told that he would not receive a final determination on his employment status until September 17, which was also the same day that his father was to be deposed for his federal lawsuit against Mercy. Although it appears that no actual investigation took place before September 17, Greg was fired on that day, allegedly for reasons related to the gift shop incident. Greg avers that his termination was in violation of the hospital's progressive discipline policy. Other employees, Greg contends, were punished less severely for far more egregious infractions.

Greg sued Mercy in the District Court for the Middle District of Pennsylvania alleging violations of the ADA, the ADEA, and the PHRA. Mercy moved for summary judgment on these claims, and the District Court granted the motion, concluding that the statutes did not allow a plaintiff to sue on the theory that he had suffered a discharge in retaliation for protected activity engaged in by another person, even if that other person was a close relative. The Court rejected Greg's alternative theories, concluding that they were unsupported by the statutory language. This timely appeal followed. The District Court had jurisdiction pursuant to 28 U.S.C. S 1331, and we have jurisdiction pursuant to 28 U.S.C. S 1291. We set forth the familiar standard of review for grants of summary judgment in the margin.3

_____

3. Our review of a district court's grant of summary judgment is plenary. See Beers-Capitol v. Whetzel, 256 F.3d 120, 130 n.6 (3d Cir. 2001). Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See F.R.C.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

7

II. The Relevant Anti-Retaliation Provisions

Greg alleges that his termination violated the anti-retaliation provisions of the ADA, the ADEA, and the PHRA. The ADA's anti-retaliation provision states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. S 12203(a). The ADEA and PHRA contain nearly identical anti-retaliation provisions, which we quote in the margin.4

Because the anti-retaliation provisions of the ADA and ADEA are nearly identical, as is the anti-retaliation provision of Title VII, we have held that precedent interpreting any one of these statutes is equally relevant to interpretation of the others. See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). The language of the PHRA is also substantially similar to these anti-retaliation provisions, and we have held that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something

_____

4. The anti-retaliation provision of the ADEA provides:

> It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. S 623(d). Similarly, the PHRA states:

> It shall be an unlawful discriminatory practice . . . [f]or any . . . employer to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

43 Pa. Cons. Stat. S 955(d).

specifically different in its language requiring that it be treated differently. See Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996). There is no argument made by either party that the PHRA should be interpreted any differently from federal law in this case. For purposes of this appeal, therefore, we will interpret the anti-retaliation provisions of the ADA, ADEA, and PHRA cited above as applying identically in this case and governed by the same set of precedents.

In addition to the anti-retaliation provision cited above, the ADA has a further anti-retaliation provision not found in the ADEA and the PHRA. That provision reads:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 USC S 12203(b). As will appear, this provision, in light of its similarity to language in the NLRA, see 29 U.S.C. S 158(a)(1), is critical to the outcome of this case.

Before analyzing each of Greg's theories of illegal discrimination, we note that in order to establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Krouse, 126 F.3d at 500. Because the District Court concluded that Greg failed to satisfy the first prong with respect to his theories of relief, it never addressed the adverse employment action and causation prongs of his retaliation claims. Consequently, we do not address those issues here on appeal in the first instance. Rather, we consider only the District Court's treatment of the "protected activity" prongs of Greg's anti-discrimination claims.

9

III. Greg's Third-Party Retaliation Claim

In arguing that Mercy unlawfully retaliated against Greg for the protected activity of his father, Greg maintains that as a matter of statutory construction, the anti-retaliation provisions are violated even if the person retaliated against did not himself engage in protected conduct. The Equal Employment Opportunity Commission ("EEOC") has filed an amicus brief in support of this position. Mercy responds that the anti-retaliation provisions only prohibit retaliation against a person who himself engaged in protected activity.

A.

In determining whether retaliation against a person who has not himself engaged in protected conduct is actionable, we first consider the ADA, 42 U.S.C. S 12203(a), ADEA, 29 U.S.C. S 623(d), and PHRA, 43 Pa. Cons. Stat.S 955(d), each of which contains similar language prohibiting retaliation. We have yet to decide squarely whether these provisions make actionable retaliation against someone who has not himself engaged in protected conduct. Among the other courts that have addressed the issue no consensus has emerged. Some courts have answered the question definitively in the negative -- i.e., a plaintiff may not present an anti-retaliation claim without personally participating in protected activity. See, e.g. , Smith v. Riceland Foods, Inc., 151 F.3d 813, 819 (8th Cir. 1998); Holt v. JTM Indus., Inc., 89 F.3d 1224, 1227 (5th Cir. 1996). But other courts have expressly acknowledged the viability of third-party retaliation claims. See, e.g., EEOC v. Nalbandian Sales, Inc., 36 F. Supp. 2d 1206, 1212 (E.D. Cal. 1998); De Medina v. Reinhardt, 444 F. Supp. 573, 580 (D.D.C. 1978).

The plain text of the anti-retaliation provisions requires that the person retaliated against also be the person who engaged in the protected activity: Each statute forbids discrimination against an individual because "such individual" has engaged in protected conduct. By their own terms, then, the statutes do not make actionable discrimination against an employee who has not engaged in protected activity. Read literally, the statutes are

10

unambiguous -- indeed, it is hard to imagine a clearer way of specifying that the individual who was discriminated against must also be the individual who engaged in protected activity. Furthermore, although there is no Third Circuit opinion squarely deciding the issue, the language of our opinions has at times reflected this literal understanding of the statute. For instance, in Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997), we stated that "[i]n order to establish a prima facie case of discriminatory retaliation, . . . [the plaintiff] must show . . . that she engaged in protected activity. . . ." Id. at 177 (emphasis added).

Nevertheless, Greg and the EEOC are correct that a literal reading of the anti-retaliation provisions is at odds with the policies animating those provisions. The anti-retaliation provisions recognize that enforcement of anti-discrimination laws depends in large part on employees to initiate administrative and judicial proceedings. There can be no doubt that an employer who retaliates against the friends and relatives of employees who initiate anti-discrimination proceedings will deter employees from exercising their protected rights. Indeed, as the Seventh Circuit sagely observed, "To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations." NLRB v. Advertisers Mfg. Co., 823 F.2d 1086, 1088 (7th Cir. 1987). Allowing employers to retaliate via friends and family, therefore, would appear to be in significant tension with the overall purpose of the anti-retaliation provisions, which are intended to promote the reporting, investigation, and correction of discriminatory conduct in the workplace. See De Medina, 444 F. Supp. at 580 (concluding that "tolerance of third-party reprisals would, no less than the tolerance of direct reprisals, deter persons from exercising their rights under Title VII").

This case, therefore, presents a conflict between a statute's plain meaning and its general policy objectives. In general, this conflict ought to be resolved in favor of the statute's plain meaning. See Caminetti v. United States, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the

11

language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms."). The preference for plain meaning is based on the constitutional separation of powers -- Congress makes the law and the judiciary interprets it. In doing so we generally assume that the best evidence of Congress's intent is what it says in the texts of the statutes. See 2A Norman J. Singer, Statutes and Statutory Construction 135, S 46:03 (6th ed. 2000).

To be sure, however, there are cases in which a blind adherence to the literal meaning of a statute would lead to a patently absurd result that no rational legislature could have intended. Following the letter, rather than the spirit, of the law in such cases would go against the court's role of construing statutes to effectuate the legislature's intent. See United States v. Schneider, 14 F.3d 876, 880 (3d Cir. 1994) ("It is the obligation of the court to construe a statute to avoid absurd results, if alternative interpretations are available and consistent with the legislative purpose."). We do not believe, however, that this is such a case. Although we think, as explained above, that recognizing third-party retaliation claims is more consistent with the purpose of the anti-discrimination statutes, we cannot say that prohibiting such claims is an absurd outcome that contravenes the clearly expressed intent of the legislature. See In re Pelkowski, 990 F.2d 737, 741 (3d Cir. 1993) ("In the absence of clearly expressed contrary legislative intent, the statutory language must be regarded as conclusive."). Rather, while we do not find them particularly convincing, there are at least plausible policy reasons why Congress might have intended to exclude third-party retaliation claims.

For instance, Congress may have thought that "[i]n most cases, the relatives and friends who are at risk for retaliation will have participated in some manner in a co-worker's charge of discrimination," thereby having themselves engaged in protected activity. Holt , 89 F.3d at 1227. If this is true, then the occurrence of pure third-party retaliation will be rare, so that not allowing claims to proceed in these few instances would not necessarily "defeat the plain purpose" of the anti-discrimination laws.

12

Bob Jones Univ. v. United States, 461 U.S. 574, 586 (1983). Put differently, barring third-party retaliation claims will not render the antiretaliation provisions completely meaningless, since they still prohibit the practice of retaliating against an employee for the employee's own protected activity, which may be the most common form of retaliation.

Moreover, Congress may have feared that expanding the class of potential anti-discrimination plaintiffs beyond those who have engaged in protected activity to include anyone whose friends or relatives have engaged in protected activity would open the door to frivolous lawsuits and interfere with an employer's prerogative to fire at-will employees. In light of these plausible explanations for excluding third party retaliation claims, we cannot say that adherence to the statute's plain text would be absurd, and we therefore conclude that the District Court was correct to reject as a matter of law Greg's third-party retaliation claims brought under the ADEA, the PHRA, and the first anti-retaliation provision of the ADA, 42 U.S.C. S12203(a).

B.

As an alternative basis for his third-party claim Greg also relies on the second anti-retaliation provision of the ADA, 42 U.S.C. S 12203(b), which reads:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

We have noted that the scope of this second anti-retaliation provision of the ADA "arguably sweeps more broadly" than the first. Mondzelewski v. Pathmark Stores, Inc. 162 F.3d 778, 789 (3d Cir. 1998). In particular, unlike the first provision, the text of this provision does not expressly limit a cause of action to the particular employee that engaged in protected activity.

13

This provision contains language similar to that found in section 8(a)(1) of the NLRA, 29 U.S.C. S 158(a)(1), which makes it an unfair labor practice for an employer"to interfere with, restrain, or coerce employees" in exercising their rights guaranteed under the Act. In Kenrich Petrochemicals, Inc. v. NLRB, 907 F.2d 400 (3d Cir. 1990) (in banc), we enforced an order of the National Labor Relations Board that interpreted section 8(a)(1) to prohibit an employer's retaliation against a supervisory employee (who was otherwise unprotected by the Act) for protected activity engaged in by her close relatives. We noted that the firing of a close relative could have a "coercive" effect on the employees engaging in protected activity, id. at 407, instilling "fear that the exercise of their rights will give the company a license to inflict harm on their family." Id. at 409. Our sister courts of appeals have also recognized that section 8(a)(1) prohibits the firing of a close relative of an employee who engages in activity protected by the NLRA. See, e.g., Tasty Baking Co. v. NLRB, 254 F.3d 114, 127–28 (D.C. Cir. 2001); NLRB v. Advertisers Mfg. Co. , 823 F.2d 1086, 1088–89 (7th Cir. 1987).

Our interpretations of the NLRA can serve as a useful guide to interpreting similar language in the ADA, as both are "part of a wider statutory scheme to protect employees in the workplace nationwide." McKennon v. Nashville Banner Pub'g Co., 513 U.S. 352, 357 (1995). The texts of section 8(a)(1) of the NLRA and the ADA's second anti-retaliation provision are essentially similar –– each makes it illegal for an employer to "coerce" or "interfere with" an employee exercising his rights under the act. In view of this fact, as well as the similar policies underlying the two provisions, it seems sensible to hold, as we now do, that Greg may assert his third-party retaliation claim under this section of the ADA just as he would be able to do under the NLRA.5 Accordingly, we will reverse the District Court's

_____

5. We recognize that the ADA's second anti-retaliation provision makes it unlawful "to coerce . . . any individual" whereas section 8(a)(1) of the NLRA makes it unlawful to "coerce employees." One could read the reference to "any individual" as limiting causes of action to those individuals who have themselves engaged in protected activity under the

14

order granting summary judgment to Mercy to the extent that it was based on the Court's view that Greg's third-party retaliation claim was not cognizable under the ADA's second anti-retaliation provision. As noted above, because the District Court did not address the second and third prongs of Greg's retaliation claim -- adverse employment action and causation -- we do not do so on appeal.

IV. Greg's "Perception Theory" of Retaliation

As a final means of showing illegal retaliation under the anti-discrimination statutes, Greg argues that even if he was not engaged in primary protected activity, Mercy perceived him to be so engaged. Greg contends that Mercy fired him with the subjective intent of retaliating against him for engaging in protected activity, thereby violating the anti-retaliation provisions. The District Court disposed of this claim as a matter of law, concluding that the statutory language did not support a perception theory of retaliation. We disagree.

Unlike the interpretation of "such individual" to allow for third party claims advocated by Greg that we rejected in Section II.A, we do not believe that the perception theory contradicts the plain text of the anti-discrimination statutes.  Rather, we read the statutes as directly supporting a perception theory of discrimination due to the fact that they make it illegal for an employer to "discriminate against any individual because such individual has [engaged in protected activity.]" 42 U.S.C. S 12203(a) (emphases added). "Discriminat[ion]" refers to the practice of making a decision based on a certain criterion, and therefore focuses on the decisionmaker's

_____

ADA in a way that the NLRA's reference to "employees" does not. We do not take such a view, however, for we believe that the shared language of the two provisions -- the prohibition on an employer "coerc[ing]" or "interfer[ing] with" protected activity-- provides the basis for allowing third party claims. This is so because action taken against the third party employee can have the effect of coercing the employee engaging in protected activity, and may also coerce other employees of the company from engaging in protected activity in the future.

15

subjective intent. What follows, the word "because," specifies the criterion that the employer is prohibited from using as a basis for decisionmaking. The laws, therefore, focus on the employer's subjective reasons for taking adverse action against an employee, so it matters not whether the reasons behind the employer's discriminatory animus are actually correct as a factual matter.

As an illustration by analogy, imagine a Title VII discrimination case in which an employer refuses to hire a prospective employee because he thinks that the applicant is a Muslim. The employer is still discriminating on the basis of religion even if the applicant he refuses to hire is not in fact a Muslim. What is relevant is that the applicant, whether Muslim or not, was treated worse than he otherwise would have been for reasons prohibited by the statute. We have adopted this same approach in the labor law context, where we have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged in protected activity. See Fogarty v. Boles, 121 F.3d 886, 891 (3d Cir. 1997); Brock v. Richardson, 812 F.2d 121, 125 (3d Cir. 1987). Accordingly, we hold that if Greg can show, as he claims, that adverse action was taken against him because Mercy thought that he was assisting his father and thereby engaging in protected activity, it does not matter whether Mercy's perception was factually correct.

As evidence of the hospital's perception that he was engaged in protected activity, Greg relies, inter alia, on the circulation of Everhart's memo, Everhart's somewhat "colder" demeanor toward him after the memo's circulation, Elias's repeated questioning, and, of course, his termination, which he alleges was in violation of the hospital's progressive discipline policy. Because, however, the District Court did not in the first instance address the question of whether this evidence presented a triable issue of fact as to Mercy's perception of Greg having engaged in protected activity, we do not delve into it on appeal. Nor, as noted above, do we address the second and third prongs -- adverse employment action and causation -- of Greg's illegal retaliation claim. Rather, we hold only that the

16

District Court erred in concluding that Greg's perception theory of illegal retaliation was invalid.

Conclusion

For the foregoing reasons, the order of the District Court granting summary judgment to Mercy will be reversed and the case remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit