Brenda BROWN, Plaintiff–Appellant,

v.

CITY OF TUCSON, a municipal corporation of the State of Arizona, Defendant–Appellee.

No. 01–16938.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 2002.

Filed July 30, 2003.

Jenne S. Forbes, Tucson, AZ, argued the case and filed the briefs for the appellant.

Lyle D. Aldridge, Gabroy Rollman, & Bosse, Tucson, AZ, argued the case and filed a brief for the appellee.

Susan R. Oxford, Washington, DC, argued for amicus curiae Equal Employment Opportunity Commission. Robert J. Gregory filed the brief. Nicholas M. Inzeo, Philip B. Sklover, and Lorraine C. Davis were on the brief.

Ellen Sue Katz, Phoenix, AZ, filed a brief for amicus curiae Arizona Attorney General. Janet Napolitano, Attorney General of Arizona, was on the brief.

Before: STAPLETON,[*] O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

---

[*] The Honorable Walter K. Stapleton, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

[1] Because Brown is suing the city because of the alleged actions of the police department, we will refer to the defendant throughout as the "Department."

O'SCANNLAIN, Circuit Judge.

We must decide whether a city police department violated a detective's rights under the Americans with Disabilities Act.

## I

Brenda Brown was a detective in the Tucson Police Department.[1] She was hired in May of 1982 and earned a promotion to detective in 1988. In May of 1997, Brown became severely depressed and attempted suicide, leading to her hospitalization and several weeks of medical leave soon thereafter. When Brown returned to work in July of 1997, the Department's consulting clinical psychologist recommended that Brown not be required to work "call out" duty,[2] as it would disrupt sleep habits and, in so doing, contribute to her depression. In addition, Brown's personal physician noted that she had been prescribed certain medications designed to help her sleep that might impair her ability to drive at night.

## A

Brown was assigned to Team Four of the Department's Neighborhood Crimes Unit, where her immediate supervisor was Sgt. Robert Holliday. Brown asserts that both she and Holliday's immediate supervisor, Lt. William Richards, informed Holliday that she was to be excused from night-time call-out duty.

Like Brown, Holliday was new to Team Four, having been transferred there for the purposes of improving the unit's performance. Over the course of the two months following Brown's return from medical leave, Holliday made a series of

---

[2] As the name suggests, call-out duty is akin to a physician's being on call; in short, it ensures that when a detective is needed, there will be one available.

inquiries about Brown's inability to perform call-out duty in what he characterized as an effort to "look[ ] for ways for her to be a contributing part of the Unit." Brown took a different view of her supervisor's actions, alleging that these efforts included (1) trying to obtain information from Brown about her disability; (2) attempting to get Brown to perform call-out duty; (3) calling Brown into his office to explain concerns Holliday had about her inability to do nighttime call-out and to ask why she could not work night shifts; (4) telling Brown to stop taking her medications for a week so she could then perform call-out duty and further telling her that if she did not do so she would be transferred, demoted, or required to take medical retirement; (5) talking on the phone with Richards about her; (6) telling her that she was "sloughing off" and "goofing off"; (7) informing her that other members of the unit were complaining about her early departures and long lunches; (8) ordering her to sign in each day if there were any deviation from her 8:00 a.m. start time; and (9) making unauthorized inquiries of the Department's Behavioral Sciences Unit concerning the nature of Brown's disability.

In response to what she perceived as Holliday's improper behavior, Brown contacted Department's Internal Affairs Division ("IAD") and was informed that she could deal with her problem through the chain of command or by filing a formal complaint with IAD, the City of Tucson, or the Office of the Arizona Attorney General. When the first option—taking her complaint up the chain of command— proved unavailing, Brown filed a complaint with IAD on September 25, 1997. This complaint was followed by an investigation culminating in a personnel report, dated October 23, 1997, that found that Holliday "asked Det. Brown if she could vary her medications for call-out ... and ... that Sgt. Holliday talked to Sgt. Easton of the Behavioral Sciences Unit to obtain information about Det. Brown and her illness." The report further found that there was "no malice and forethought conjoined with these actions or statements ... and there is every reason to believe that [Holliday's] intent was honorable." Nevertheless, the report concluded that. "the residual effect[of Holliday's actions] was less than positive and in many regards debilitating and counterproductive as viewed by [Brown]." Holliday therefore was required to undergo training and to "educate[ ] himself on the proper ways to handle an employee who has either a medical or a disability issue."[3]

### B

At roughly the same time that the above-described events were taking place, Brown was working with Holliday on a case involving allegations of an assault committed by a doctor against a nurse at a local hospital ("the assault case"). Sometime in early September 1997, Brown issued a citation to the accused doctor that listed September 22, 1997, as the date upon which he was required to· appear in court.[4] On October 1, 1997, however, a clerk was emptying the Unit's paperwork[5]

---

**3.** The record reflects that Holliday eventually met with a Sgt. Washington and received "specific training in the area of employee disabilities and their rights resulting from the Americans with Disabilities Act" on November 20, 1997.

**4.** Under Arizona law, the Arizona Traffic Ticket and Complaint form is used in lieu of a criminal complaint. *See* Ariz.Rev.Stat. § 13–3903(D). The form has a box to indicate the date the offense was allegedly committed and another to indicate the court date for the arraignment. There is, however, no space in which to record the date of the citation.

**5.** The clerk was responsible for ensuring that documentation, including citations, were paired up with the relevant supplemental reports before being routed to the Department's records division and then on to City Court, or some other destination.

from the basket on her desk—something she does several times a day—when she came upon the citation in the assault case and noted that the court date written on it had already passed. After making some initial inquiries that confirmed that the case was still open, the clerk informed Holliday who on that same day was being interviewed by IAD in connection with Brown's complaint against him. Holliday sought guidance on how to proceed from Richards, his supervisor, and was instructed to preserve the integrity of the assault case investigation.

On that same day, Holliday contacted Nancy Coomer, the attorney of record for the defendant in the case and learned that she was no longer representing the defendant, but that the case had been referred to a second attorney, Michael Piccaretta. Upon contacting Piccaretta, Holliday learned that Piccaretta and his client had indeed appeared on September 22, as called for on the citation, but were told that the court had no record of any citation being filed. On the next day, Brown was out of the office,[6] so Holliday himself went to Piccaretta's office to issue a new citation. Holliday next decided to check Brown's case status report, a chronological log of activities that detectives are expected to keep as an aid to completing the supplemental reports that follow upon the issuance of a citation. Brown's case status report for the assault case showed a citation date of October 1, a date that Holliday knew to be incorrect because he was pres-

ent when Brown issued the original citation in September.

In light of the erroneous case status report and the manner in which the citation had been placed among current documentation in the clerk's "in" basket, Holliday suspected that something more than mere citation error was afoot. He asked the clerk who discovered the citation to prepare a memo detailing her actions and, rather than confront Brown, decided to wait and see how she dealt with the discrepancy in her supplementary report, which had been due on September 20.[7] Brown's supplementary report, filed on October 21, states that, on October 7, the defendant and his lawyer[8] "arrived at the east-side substation. Ms. Coomer spoke to both Sgt. Holiday [sic] and I[sic]. She was trying to convince us not to cite her client. Sgt. Holiday explained to her that this was not appropriate, and that she could take her case before the court. Mr. Hammond was issued a citation and field released."

Again, Holliday knew this information to be inaccurate and he once again sought guidance from his superiors—Richards and Capt. John Leavitt—who determined that Holliday should be dissociated from any further investigation regarding Brown's handling of the assault case because of concerns that any involvement would expose him to charges of retaliation. Richards and Leavitt decided to refer the matter to IAD.

Later that month, Holliday was replaced as head of Team Four by Sgt. Robert Garcia. Garcia's treatment of her, Brown contends, was similar to Holliday's.[9] Spe-

---

6. Brown was absent from work for both the days immediately before as well as the days immediately after October 1.

7. Issuing a citation is one of the ways in which a case is "closed," and the detective issuing the citation is expected to file a supplementary report within a few days after the issuance of the citation.

8. Brown's report identifies Coomer as the defense attorney despite the fact that, at least as of September 22, she was no longer representing the defendant in the assault case.

9. Brown contends that Holliday and Garcia "seemed to be friends," and expressed con-

cifically, while Garcia was her supervisor, Brown alleges that (1) she was informed by co-workers that an arrangement had been made so that Brown would do all the daytime call-out work; (2) when she asked Garcia about the "arrangement," he confirmed its existence and justified it on the grounds that Brown could not do nighttime call-out, but then retracted the statement, saying only that he did not know why Brown had not been informed of the arrangement; and (3) she met with Garcia and Richards on December 3 about the call-out issue and requested a transfer, only to be told that her options were limited to working in the fraud unit (where her ex-husband was employed), being demoted to uniform, or quitting.

## C

Meanwhile, Brown remained unaware of the investigation into her handling of the assault case. Eventually, Garcia sought an explanation from her in a memo dated December 9, 1997. Garcia's memo noted the discrepancies—i.e., the three different dates for the citation: the date of the original citation in September, the date on Brown's case status sheet (October 1, 1997), and the date in her supplemental report (October 7, 1997)—and asked for an explanation. In her response, Brown claimed that she had mistakenly written a court date of September 22, 1997, instead of October 22, 1997, on the original citation. She further contended that on October 1, 1997, she had spoken with the defendant's attorney and then with Holliday before issuing the citation on October 7.

On December 11, Garcia informed Brown that he would review the facts and provide a recommendation to the division commander.

Brown went on medical leave from January 8, 1998, until April 8, 1998. In February, she prepared a memorandum to IAD recounting the events pertinent to the investigation into her citation and report discrepancies. In the memo Brown once again asserted that she issued the citation in the assault case on October 1 and that she wrote the court date of September 22 in error. She further stated that she had "no specific recollection now of whether I put the copy of the citation in the distribution basket for records or left it on my desk to turn in the following day." [10] As for her two subsequent reports, Brown contended that the October 1 citation date recorded on her case status sheet is correct, while the October 7 citation date recorded in her supplemental report "was an error, due to inadvertance, possibly a typographical error and my failure to double-check the information." Finally, Brown's memo to IAD complained that "Sgt. Holliday never told me directly that I had written the wrong court date on the citation," even though "he knew of the wrong court date within a day of my writing [the citation]."

On March 20, 1998, during an interview conducted by an official from IAD, Brown once again reiterated that she had erroneously entered the court date on the citation, writing September 22 instead of October 22. In April, Garcia issued his personnel report concerning the investiga-

cern to Garcia that their relationship would negatively affect her working conditions. Garcia informed her that he and Holliday were not friends, though they had lunched together and belonged to the same Optimists Club.

10. It is uncontroverted, however, that the unit's clerk discovered the citation no later than October 1 and that she had a practice of emptying the basket each day. These facts, along with the fact that Brown was absent from work on October 2, indicate that someone must have placed the citation in the clerk's basket on October 1.

tion in which he recommended Brown's termination because she had failed to submit the citation in a timely manner and "had attempted to conceal the mishandling of the citation by circumventing the established system of checks and balances." Garcia's recommendation was seconded by Lt. Stella Bay and Capt. Anthony Daykin in reports dated April 27 and May 11, 1998, respectively. Assistant Chief Collier Hill, after originally concurring in the termination recommendation, reconsidered and imposed a 10–day suspension on July 15, 1998. Brown served her suspension but did not return to the Department, taking leave and ultimately medical retirement, effective December 3, 1998.

### D

Brown filed suit on September 24, 1999, seeking back pay, the value of lost benefits, compensatory damages, and the difference between the retirement benefits she actually received and those she would have received had she remained on the force until her intended retirement date of 2002. Brown alleged violations of two provisions of the Americans with Disabilities Act ("ADA"). Specifically, Brown claimed that the investigation and disciplinary action taken against her amounted to retaliation in violation of § 503(a) of the ADA, 42 U.S.C. § 12203(a), and that the behavior of Department officials—chiefly Holliday—constituted acts of interference, coercion, and intimidation against her in violation of § 503(b). *Id.* § 12203(b).

In due course, the Department moved for summary judgment on the ground that Brown had not offered any proof that the department's asserted reason for the action taken against her was a pretext for retaliation. The district court agreed and, in a nine-page order dated March 30, 2001, granted the motion—but only in part, noting that "Defendant specifically fail[ed] to mention" Brown's interference claim under

§ 503(b) in its motion for summary judgment. The court gave the parties the option of filing supplemental briefs on the appropriateness of summary judgment with respect to the interference claim. The parties did so, and on August 24, 2001, the district court granted summary judgment to the defendant on Brown's interference claim and Brown filed this appeal.

### II

 Brown first contends that, by instituting an investigation into her handling of the assault case and by suspending her as a result of that investigation, the Department retaliated against her in violation of § 503(a) the ADA. Section 503(a) of the ADA provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). Courts that have had occasion to apply this section of the ADA have almost uniformly adopted the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1121 (9th Cir.2000) (en banc) ("[W]e join our sister circuits in adopting the Title VII retaliation framework for ADA retaliation claims."), *vacated on other grounds, U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 54 (2d Cir. 2002) ("We apply the *McDonnell Douglas* burden-shifting rules to claims of retaliation pursuant to" the ADA.); *Kersting v. Wal–Mart Stores, Inc.,* 250 F.3d 1109,

1117 (7th Cir.2002) (same); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir.2002) (same); *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir.2001) (same); *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1121–22 (5th Cir. 1998) (same); *New England Health Care Employees Union v. Rhode Island Legal Servs.*, 273 F.3d 425, 429 (1st Cir.2001) (same); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir.2001) (same); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 588–89 (6th Cir.1998) (same).

Thus, it was not without some authority that the district court, in ruling on Brown's retaliation claim under § 503(a) of the ADA, decided to apply the burden-shifting analysis under which the plaintiff must make out a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000).

Brown was engaged in activity protected by the ADA when she lodged a complaint against Sgt. Holliday, for § 503(a) clearly protects "any individual" who "made a charge." 42 U.S.C. § 12203(a).[11] Similarly, it is clear that Brown was subjected to an adverse action in the form of the investigation and the suspension.

The Department disputes that there was a causal link between the two, citing *Clark County School District v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), for the proposition that mere temporal proximity is always dubious evidence of causation. But *Clark County* does not stand for such a proposition—quite the opposite. The Court in *Clark County* was distinguishing the case before it from "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence," noting that the latter cases "uniformly hold that the temporal proximity must be 'very close.'" *Id.* at 273, 121 S.Ct. 1508 (citations omitted). In this case, given that Holliday's investigation into Brown's conduct began the very day he was interviewed regarding her complaint against him, and given that on summary judgment all factual disputes must be resolved in favor of the plaintiff, the district court was correct in finding that Brown had made out a prima facie case of retaliation.

The district court nevertheless found that the Department had adduced a non-retaliatory explanation—namely, that Brown was suspended for falsifying her reports in an effort to cover up the fact that she had failed to timely submit the citation in the assault case—and further found that Brown had failed to present evidence sufficient to show that the Department's explanation was pretextual.

Brown's challenge to the Department's non-retaliatory justification for suspending her rests upon circumstantial evidence: most notably the temporal proximity between Brown's ADA complaint and the discovery of the problematic citation, the fact that Holliday was the one who unearthed the potential problem and the fact that Holliday failed to notify her of the problem right away thereby depriving her of an opportunity to correct it. The relevance of these facts, however, is belied by uncontroverted evidence indicating 'that Brown herself turned in the late citation on October 1, more than a week after the

---

**11.** The Department argues that Brown has failed to establish that her depression was a disability or that her accommodation was one she had a right to enjoy under the ADA. This argument, however, was not presented to the district court and so we decline to consider it for the first time on appeal. *See In re Prof'l Inv. Props. of America*, 955 F.2d 623, 625 (9th Cir.1992).

court date listed on its face—thereby indicating that she was aware of a problem with the citation—and by the fact that Holliday did not suspect anything was seriously amiss until the day *after* he learned of the citation. This latter fact is critical because it was only on that date that Holliday inspected Brown's case log and found that she had entered October 1 as the date of the citation, a discovery which, when placed alongside the suspicious appearance of the citation in the clerk's mail basket, elevated a simple citation problem into a potential coverup.

Moreover, it is uncontested that Department procedures require officers having knowledge of violations committed by other officers to report such violations. Tucson, Ariz., Police Dept. Rule 3.03 ("Members having knowledge of other members violating laws, ordinances, Department rules, or disobeying orders, shall report such violation in writing to the Chief of Police through official channels."). The only evidence Brown offers to countermand this provision is her own observations that problems with citations were common and tended to be resolved informally. But such observations are irrelevant: The problem was not with the *citation itself,* but rather with Brown's tardy submission of it and her subsequent reports and statements regarding it. Brown offers no evidence that errors in police reports (intentional or otherwise) were common or were dealt with informally, which leaves the Department's procedures as uncontroverted evidence that Holliday had no discretion to ignore Brown's actions, but instead was required to report them.[12]

Under Ninth Circuit law, "[c]ircumstantial evidence of pretext must be specific and substantial in order to survive sum-

mary judgment." *Bergene v. Salt River Agric. Improvement & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir.2001). Brown's evidence is neither and, as a result, "she has not shown that either ... a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir.2002). Accordingly, we are satisfied that the district court properly granted summary judgment to the Department with respect to Brown's retaliation claim under § 503(a).

### III

■ Brown next claims that the conduct of Holliday (and subsequently, Garcia) amounted to interference with her rights under the ADA in violation of § 503(b). We begin with the text of the statute:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). The district court found that "the distinct nature of the two ADA provisions does not prevent the courts from applying the same general framework to both retaliation and interference claims" and concluded that "existing Title VII employment standards" governed Brown's interference claim. Applying the retaliation standard, the district court found that "summary judgment is appropriate on the interference claim because the Plaintiff did not allege that she suf-

---

12. We also note that superiors who were uninvolved with Brown's complaint against Holliday—and thus had no reason to retaliate against her, most notably Capt. Daykin and Chief Hill—played a significant and even decisive role in her suspension.

fered an adverse employment action as a result of the alleged interference, coercion or intimidation." Alternatively, the district court also noted what it termed "the Ninth Circuit's propensity to look to existing Title VII employment standards" when considering ADA claims and found that "Plaintiff's suggested approach would be most akin to a hostile environment harassment claim." Because Holliday's behavior "fail[ed] to rise to the necessary severity," the district court found that summary judgment was appropriate.[13]

### A

The Department contends that the district court was correct in analogizing Brown's interference claim to a hostile work environment action and, in support of its contention, cites *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir.1999). In *Silk*, a police officer who had sleep apnea sought and received an accommodation that allowed him to work only during the daytime. As in the present case, this accommodation resulted in some ill-will among the officer's supervisor and co-workers, who directed insults and profanities his way on several occasions. Additionally, the officer was disciplined for working a second job in the evenings because it violated a department policy prohibiting officers on limited duty, as Silk was, from engaging in secondary employment inconsistent with their limited duty status. Silk sued, claiming that this discipline was in retaliation for his accommodation in violation §§ 503(a) and (b), and that the behavior of his co-workers and supervisor constituted a hostile work environment. The Seventh Circuit rejected Silk's retaliation claim, ruling that there was no causal link between the action and Silk's accommodation and that, even if there were, the department had a sufficiently non-pretextual reason for its disciplinary action against Silk, namely the police department's policy on secondary employment for limited-duty officers. *Id.* at 801. The Court also held that Silk had failed to set forth facts sufficient to survive summary judgment on his hostile environment claim because the

---

**13.** The district court's decision to look to Title VII case law for guidance in addressing Brown's § 503(b) claim is understandable. Of the nine published courts of appeals decisions to have expressly dealt with this provision of the ADA, six have simply noted § 503(b)'s existence alongside § 503(a) and held, without much discussion, that both provisions are retaliation provisions warranting Title VII-style burden shifting. *See Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir.1999) (finding 503(b) to be part of the ADA's retaliation provision); *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 54 (applying burden-shifting to 503(b) claim); *Barnett*, 228 F.3d at 1121 (noting both sections and "[a]dopting the Title VII retaliation framework for ADA retaliation claims."); *Fogleman*, 283 F.3d at 570 (holding that 503(b) is a "second retaliation provision" under the ADA); *Selenke*, 248 F.3d at 1264 (treating 503(a) and (b) as retaliation provisions subject to Title VII analysis); *Butler v. City of Prairie Vill.*, 172 F.3d 736, 752–53 (10th Cir.1999) (same). Only one of these decisions, the Third Circuit's holding in

*Fogleman* makes any attempt to distinguish the two provisions—but the distinction it draws is that, unlike § 503(a), § 503(b) "does not expressly limit a cause of action to the particular employee that engaged in protected activity." *Fogleman*, 283 F.3d at 570.

The three remaining court of appeals decisions examine § 503(b) independently of § 503(a). *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001) (finding that "a jury could reasonably find" that a letter suggesting that legal action would be taken if employee continued to seek ADA relief violated § 503(b)); *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 789 (3d Cir.1998) (instructing district court to consider on remand plaintiff's claims under § 503(b) because that section "arguably sweeps more broadly" than § 503(a)); *Champagne v. Servistar Corp.*, 138 F.3d 7, 14 (1st Cir.1998) (rejecting plaintiff's claim under § 503(b) because "we do not think the [allegedly threatening action] may be reasonably viewed as a threat or interference").

charged actions "have not altered a term or condition of Sergeant Silk's employment." *Id.* at 808. The court made this determination, it is important to note, without deciding the underlying issue of whether such a cause of action existed under the ADA. *Id.* at 804.

While, at first glance, the Department's emphasis on *Silk* appears to be warranted, one critical distinction makes the case ultimately inapplicable here. In ruling on Silk's hostile environment claim, the Seventh Circuit noted that "such a claim would seem to arise under the general prohibition against discrimination with respect to terms or conditions of employment contained in 42 U.S.C. § 12112(a) and in 29 C.F.R. § 1630.4(a), which provides that it is unlawful to discriminate against a disabled employee in regard to any 'term, condition, or privilege of employment.'" *Silk,* 194 F.3d at 803. By contrast, in the present case, Brown *does not* advance a "hostile work environment" claim, but relies instead on § 503(b)'s bar on coercion, threats, intimidation, and interference.

While ultimately inapplicable to the claims before this panel, *Silk* is nevertheless helpful as a point of contrast. For if the Seventh Circuit's assumption is correct—i.e., that there is a "hostile work environment" claim under the ADA [14] and that the source of such a cause of action is § 12112(a)—it would suggest the that the same "hostile work environment" analysis is inapplicable to claims brought under § 503(b).

Of course, such would be the case only if the source of the "hostile work environment" claim asserted in *Silk* were, in fact, located elsewhere in the statute—that is, in 42 U.S.C. § 12112(a). The Seventh Circuit assumed for the sake of argument that § 12112(a) gave rise to such a claim without so holding. Our court has not yet held that such a claim exists, let alone what its source in the statute might be. We decline to do so here, but nevertheless note that § 12112(a)'s prohibition of employment discrimination against the disabled would appear to lend support to Brown's argument that § 503(b) of the ADA gives rise to something other than a Title VII-style "hostile environment" claim. We turn to that argument now.

## B

Brown and *amici* [15] urge reversal on the grounds that the district court's application of Title VII's harassment standard conflicts with the plain language of § 503(b). They contend, first, that the words "intimidate," "coerce," "threaten," and "interfere" should be accorded their usual, dictionary meaning. Doing so, they contend, obviates any need to import any form of Title VII analysis and, indeed, positively precludes it.

Second, Brown and *amici* argue that if any extraneous statutes should be looked to for guidance, there are far better candidates than Title VII. They note that § 503(b) of the ADA resembles the interference provisions in the National Labor Relations Act ("NLRA") and the Family

---

**14.** Two circuits have decided that there is such a claim, and both grounded the claim in § 12112(a). *See Flowers v. S. Reg'l Physician Servs.,* 247 F.3d 229, 233 (5th Cir.2001), *and Fox v. Gen. Motors, Corp.,* 247 F.3d 169, 176–77 (4th Cir.2001). Several others have assumed the existence of such a claim, without expressly so holding. *See generally* Lisa Eichhorn, *Hostile Environment Actions, Title VII,*

*and the ADA: The Limits of the Copy–and–Paste Function,* 77 Wash. L.Rev. 575, 575 n. 2 & 3 (2002).

**15.** Briefs advancing substantively similar positions were filed by both the Equal Employment Opportunity Commission and the Arizona Attorney General.

and Medical Leave Act ("FMLA"). *See* 29 U.S.C. § 158(a)(1) (provision of the NLRA making it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of rights guaranteed by [the act]") *and* 29 U.S.C. § 2615(a)(1) (provision of the FMLA making it unlawful for the employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the act). Reading the case law interpreting these provisions, Brown and *amici* argue, shows that the provisions consistently have been interpreted broadly, barring any conduct that "tends to chill an employee's freedom to exercise his [statutory] rights." *Cal. Acrylic Indus., Inc. v. NLRB*, 150 F.3d 1095, 1099 (9th Cir.1998); *see also Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir.2001) (holding that the FMLA's anti-interference provision bars conduct that " 'tends to chill' an employee's willingness to exercise" rights under the statute).

More persuasive is Brown's and *amici's* citation to the anti-interference provision in the Fair Housing Act ("FHA"), 42 U.S.C. § 3617, a provision that was itself referenced in a Committee Report preceding the passage of the ADA. *See* H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 138 (1990) *reprinted in* 1990 U.S.C.C.A.N. 303, 421 ("The Committee intends that the interpretation given by the Department of Housing and Urban Development to a similar provision in the Fair Housing Act ... be used as a basis for regulations for this section."). Indeed, § 503(b) adopts the terms of the FHA provision verbatim. *See* 42 U.S.C. § 3617 (FHA provision making it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed ... any right granted or protected by [the Act]").

C

Mindful that similarities between statutory provisions are an indication that Congress intended the provisions to be interpreted the same way, *see Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), our construction and application of § 503(b) ought to be guided by our treatment of the FHA's interference provision, 42 U.S.C. § 3617, as well as similar provisions in the FMLA and NLRA. Accordingly, we cannot affirm the district court's decision to analyze Brown's § 503(b) claim under Title VII's burden-shifting or hostile environment frameworks.

We have held that the language of the FHA's interference provision should be "broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (*"Hayward"*). Beyond announcing this principle of broad applicability, *Hayward* offers little guidance on how to transpose the FHA's interference provision to the context of the present case—as can be seen from a quick glance at some of the activities we identified in *Hayward* as falling within the ambit of the FHA's interference provision: " 'Interference' ranges from racially motivated firebombings to exclusionary zoning and insurance redlining." *Id.* (citations omitted).

Our most recent pronouncement on the FHA's interference provision applied a more recognizable standard for gauging "interference." In *Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir.2001), we analyzed a claim brought under the FHA's interference provision using "the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*." *Walker*, 272 F.3d at 1128 (citation omitted). As we noted in Section

II *supra,* this familiar test requires the plaintiff to establish a prima facie case by showing that (1) he was engaged in protected activity; (2) he suffered an adverse action; and (3) there was a causal link between the two. *Walker,* 272 F.3d at 1128. In *Walker* we adapted the burden-shifting approach to fit the FHA's interference provision, modifying somewhat the second element of the prima facie case to reflect the plain language of the statute. That is, having found that the claimant was engaged in some form of protected activity, we next inquired whether the claimant had "suffered an adverse action ... in the form of 'coerc[ion], intimidat[ion], threat[s], or interfere[nce].'" *Id.* at 1128 (alterations in original). In making this inquiry in *Walker,* we noted that we were guided by the plain language of the statute, the Supreme Court's instruction that we treat "[t]he language of the [FHA as] broad and inclusive," *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), as well as our own recognition in *Hayward* of the broad scope of the term "interference." [16]

While applying the same burden-shifting analysis to Brown's § 503(b) claim would provide us with a more readily applicable standard, we recognize that Brown's § 503(b) claim, unlike her § 503(a) claim and unlike the claim of the plaintiff in *Walker,* alleges *only* interference, not interference *and* retaliation. *See Bachelder,* 259 F.3d at 1124 (holding that a claim brought under FMLA's interference provision "does not fall under the 'anti-discrimination' or 'anti-retaliation' provision" of the FMLA, and so is not properly susceptible to burden-shifting analysis). We also recognize, however, that while the terms of the interference provision are broad, we must nevertheless tread carefully in applying them to the facts of the present case, arising as it does in the employment context. For, the same "countervailing concerns" we confront in the context of retaliation claims, *Brooks,* 229 F.3d at 928, are present here. As we noted in *Brooks:*

> On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions.

*Id.* If anything, the ADA's interference provision presents these problems more acutely than does its anti-retaliation provision because the former protects a broader class of persons against less clearly defined wrongs. Clearly, anti-interference provisions such as those contained in the FHA and ADA cannot be so broad as to prohibit "any action whatsoever than in any way hinders a member of a protected class." *Mich. Prot. & Advocacy Serv. v. Babin,* 18 F.3d 337, 347 (6th Cir.1994).

■ Fortunately, we are spared the difficulty of defining precisely what constitutes "interference"—or even "coercion" or "intimidation"—within the terms of § 503(b). For whatever else that provision may prohibit, it clearly makes it unlawful to "*threaten* ... any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C. § 12203(b) (emphasis added). The Department is correct to note that § 503(b) is not a model of draftsmanship. Poor phrasing aside, it is clear that, given the broad remedial purpose of the ADA, *see* 42 U.S.C. § 12101(b)(1) ("It is the purpose of this chapter to provide a clear and comprehen-

---

**16.** We applied the third element of the prima facie case—and indeed the remainder of the burden-shifting approach—in the usual fashion.

sive national mandate for the elimination of discrimination against individuals with disabilities."), the plain language of § 503(b) clearly prohibits a supervisor from threatening an individual with transfer, demotion, or forced retirement unless the individual foregoes a statutorily protected accommodation. We emphasize that conclusory allegations—without more—are insufficient to state a violation of § 503(b). An ADA plaintiff must also demonstrate that she has suffered a "distinct and palpable injury" as a result of the threat. *See Walker*, 272 F.3d at 1123. That injury could consist of either the giving up of her ADA rights, or some other injury which resulted from her refusal to give up her rights, or from the threat itself. *See id.; Bachelder*, 259 F.3d at 1124.

■ We are quite convinced that, even assuming their truth, some of Brown's allegations do not constitute a violation of § 503(b)—specifically her assertions that Holliday talked on the phone with Richards about her; told her that she was "sloughing off" and "goofing off"; and informed her that other members of the unit were complaining about her early departures and long lunches. We are equally confident that other allegations—most notably Holliday's demands that Brown stop taking her medications and perform night-time call-out or face demotion or forced retirement—do constitute actionable threats because Brown has alleged that she has suffered short-term memory problems and felt extremely stressed, harassed, and pressured by Holliday. These allegations of direct harm resulting from Holliday's threat—especially when viewed alongside Brown's assertions that Holliday

made unauthorized inquiries to the Department's Behavioral Sciences Unit and repeatedly questioned Brown herself regarding the nature of her disability—would constitute a violation of § 503(b) if proven at trial.

We are sensitive to the Department's contention that too broad a reading of the ADA's interference provision, when viewed in light of the employer's obligation under the Act to "make a reasonable effort to determine the appropriate accommodation" for a disabled employee, 29 C.F.R. Pt. 1630, App. § 1630.9, has the potential to confront employers with potentially conflicting obligations. While we reiterate our belief that the ADA's interference provision does not bar "any action whatsoever that in any way hinders a member of a protected class," *Babin*, 18 F.3d at 347, we note that the facts in the instant case reveal that Brown already had been granted her accommodation—viz., no night-time call-out duty—by the time Holliday took the actions of which Brown complains. Furthermore, we fail to see how ordering an employee to forego her accommodation or face adverse employment consequences can reasonably be interpreted as part of a "reasonable effort to determine the appropriate accommodation." [17]

### IV

Because we conclude, first, that Brown has failed to raise a triable issue of fact with respect to her retaliation claim and, second, that Brown has raised a triable issue of material fact with respect to her interference claim, the judgment of the district court is

---

17. This might be a different case if the Department had demonstrated that night-time call-out duty was an essential function of the job. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(n). The facts as alleged by Brown, however—specifically the Department's apparent willingness to allow her to avoid night-time call-out—indicate that it was not an essential function.

AFFIRMED in part, REVERSED in part, and REMANDED.