FERGUSON, Circuit Judge.
The issue in this case is: what showing of pretext must a plaintiff in a retaliation suit make in order to overcome a defendant’s motion for summary judgment, where the defendant has alleged legitimate reasons for the plaintiffs termination. Appellant Lynda Stegall (“Stegall”) appeals the District Court for the Eastern District of Washington (“District Court”)’s grant of summary judgment in favor of defendant Marathon Media, L.P. (“Marathon”), which foreclosed a jury trial on Stegall’s retaliation claim under Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination (“WLAD”). The District Court held that, although Stegall established a prima facie claim of retaliatory discharge against Marathon, she was unable to demonstrate that Marathon’s nondiscriminatory reasons for terminating her were a pretext for retaliation. Stegall alleges that she was fired from KORD, a country music radio station, in retaliation for making complaints about gender discrimination and wage disparities between male and female employees at *1011 KORD. Because Stegall raises a triable claim with respect to her retaliation claim, we reverse the District Court’s grant of summary judgment in favor of Marathon.
I BACKGROUND
A. Facts
Lynda Stegall was employed by Citadel Broadcasting Company (“Citadel”) as an on-am personality at KORD, a country music station that played recent country music hits,[1] since 1993. Beginning in 1997 or 1998, Stegall began to make complaints to her managers at Citadel that her male on-air personality co-host was sexually propositioning her and using sexually suggestive language on and off the air. She also complained that she was being paid less than her male counterparts and requested a raise. Allegedly, Citadel management did not adequately address her complaints.
Stegall’s problems with KORD escalated in October 1998 when Stegall took time off from work because she fell ill from the stress and anxiety she was experiencing as a result of KORD’s gender discrimination, and because her managers were being unresponsive to her grievances. When she returned to work, Stegall averred that Curt Cartier (“Cartier”) who, at the time, was employed as the program director for another one of Citadel’s radio stations, exhibited a great deal of hostility toward her. Stegall stated in her deposition that prior to her two week leave of absence, she and Cartier had been friends. Stegall had previously spoken with Cartier, as well as other station employees, on various occasions, about her complaints of gender discrimination at KORD. However, Stegall noted that upon her return, Cartier refused to speak with her. Stegall believed that Cartier was upset because she had walked out of KORD to protest the unequal treatment that she was receiving, and because she was given a raise in salary as a result.
In addition, Cartier allegedly told other station employees that he was angry at Stegall for getting what she wanted and had only been able to do so because she was a woman. On two occasions after coming back to work, Stegall alleges that Cartier yelled at her and denigrated her based on her gender, calling her names such as “slut,” “bitch,” and “whore,” in the course of arguments that were seemingly about unrelated station matters.
On November 9, 1999, Marathon Broadcasting (“Marathon”) purchased five Pasco, Washington radio stations from Citadel, including KORD. After taking over KORD, Marathon initially retained most KORD employees, a decision that was necessary to ensure continual, uninterrupted broadcasting.[2] Upon Marathon’s purchase of Citadel’s stations, Eric Van Winkle (“Van Winkle”) became the new general manager (“GM”), responsible for supervising KORD and the four other stations that Marathon acquired from Citadel. Prior to assuming the GM position with Marathon, Van Winkle worked in the central sales department for the five Pasco, Washington radio stations when they were owned by Citadel. Shortly after Van Winkle’s promotion, he hired Paul Drake and Curt Cartier to serve as co-program directors of KORD under Marathon. Drake and Cartier pre *1012 viously held positions as program directors for other radio stations in the Pasco cluster. As program directors, Drake and Cartier were responsible for the content and presentation of KORD.
Due to the change in management and the impending station changes that it was bound to bring, Stegall inquired with Marathon about the security of her employment at KORD on several occasions before she was terminated. Shortly after Van Winkle became manager and Drake became co-program director, Stegall stopped by their individual offices to ask whether her job was secure. Both responded affirmatively.
In early December 1999, Stegall and Drake, now her direct supervisor at KORD, had a “get to know you” meeting during which Stegall relayed to Drake the complaints of gender discrimination that she had made to Citadel’s managers in the past, and the problems she had been having, with Citadel up until Marathon’s purchase of KORD. Stegall stated in her deposition that she brought Drake up to speed about her prior concerns, and expressed a desire to see Marathon conduct things differently and remedy the gender inequities. Stegall noted that Drake did not speak much during this meeting and, as a result, she felt very uncomfortable.
Nine days after Stegall complained to Drake, on December 15, 1999, Marathon fired Stegall and one other female employee, Kristin Crume. Stegall was told during a meeting with Van Winkle, Drake and Cartier that they were planning changes for KORD which did not include her and, as a result, she was being terminated. At this time, Stegall inquired if anything she had done brought on the decision to fire her, and she was explicitly told that it had not. Rather, the decision, she was told, was solely about the future of KORD.
Similarly, when Stegall later applied for unemployment benefits, Marathon informed the state Employment Security Department that a business decision based on changing the programing and formatting was responsible for Stegall’s termination, and that nothing she had done caused the discharge. However, after the commencement of this litigation, Van Winkle. and Drake stated in their depositions that Stegall was fired in part because they were not satisfied with her overall attitude during the brief period of time[3] she was employed by Marathon.
After Stegall’s termination, Marathon began making changes to KORD. KORD was switched from station-selected music to a computerized music service; Marathon brought in Leah Knight, a syndicated host from Seattle; changed each of the shows and did on-air promotions about the format changes; stressed a different “brand” of country music;[4] removed all of the daily on-air personalities; and replaced seven announcers on five shifts including every morning show host. The only former daily on-air personality who remained at KORD after the broad station change was Ed Dailey, who was removed from daily duties and given a four-hour Sunday morning “oldies” show. However, Stegall and one other woman[5] were the only em *1013 ployees who were fired from KORD and not re-assigned to another station within the Pasco cluster.[6]
B. Procedural history
On August 2, 2000, Stegall filed this litigation against Citadel and Marathon, alleging gender discrimination, sexual harassment, and retaliation in violation of both Title VII and WLAD. On December 19, 2001, Stegall stipulated to the dismissal of all claims of sexual harassment and retaliation against Citadel, and stipulated to the dismissal of all claims of sexual harassment against Marathon. The District Court granted summary judgment to Marathon on Stegall’s Title VII and WLAD claims of illegal retaliation, finding that Stegall was unable to demonstrate that Marathon’s legitimate reasons for terminating her were pretextual. Because Stegall has proffered a substantial amount of specific circumstantial evidence that Marathon’s reasons for terminating her were motivated by retaliation, we reverse the District Court’s decision.
II STANDARD OF REVIEW
We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (2000). The District Court granted summary judgment in favor of Marathon, finding that, although Stegall made a prima facie showing of retaliation, she could not rebut the legitimate reasons put forth by Marathon for terminating her. “We review the district court’s decision to grant summary judgment de novo.” Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1219-20 (9th Cir. 1998) (citations omitted). Viewing the evidence in the light most favorable to Ste-gall, we must determine whether any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law. Id. at 1220. In doing so, “[t]he evidence of the [non-moving] party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in the light most favorable to[her].” Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir.1991).
Ill DISCUSSION
Stegall contends that she was illegally terminated in retaliation for making wage discrimination complaints to Marathon that she believed to be the result of gender discrimination in violation of Title VII and the WLAD. Because Washington courts look to federal law when analyzing retaliation claims, we consider Stegall’s Washington state law claim and federal claim together. See Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir.2002); Graves v. Dep’t of Game, 76 Wash.App. 705, 887 P.2d 424, 428 (1994).
A. Prima facie case of retaliation
Stegall alleges that Marathon terminated her employment in retaliation for complaining to Marathon of a disparity in pay and bonuses between herself and her male counterparts. Under § 704 of the Civil Rights Act of 1964, it is unlawful “for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].” 42 U.S.C. § 2000e-3 (2000). To make out a prima facie case of retaliation under Title VII, Stegall must demonstrate that “(1) she engaged in a protected activity, (2) she *1014 suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision.” Road v. Fairbanks North Star Borough Sch. Dist, 323 F.3d 1185, 1196-97 (9th Cir.2003). If Stegall is able to assert a prima facie retaliation claim, the “burden shifting” scheme articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir.2002).
Under McDonnell Douglas, once Stegall makes out a prima facie case of retaliation, “the burden shifts to [Marathon] to articulate a legitimate, non-discriminatory reason for the adverse employment action.” Manatt v. Bank of Am., N.A., 339 F.3d 792, 800 (9th Cir. 2003). If Marathon articulates such a reason, Stegall “bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.” Id. (internal quotation marks and citation omitted).
B. Pretext
Stegall has two avenues available for showing that Marathon’s legitimate explanation for firing her is actually a pretext for retaliation. The first is by “directly persuading the court that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer’s proffered explanation is unworthy of credence.” Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citation omitted).
As in all civil cases, Stegall can prosecute her case using either direct or circumstantial evidence tending to prove that Marathon terminated her employment in retaliation for making complaints of gender discrimination. “ ‘Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.’ ” Godwin v. Hunt Wesson, Inc., 150 F.3d at 1221(quoting Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir.1994)). “When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.” Id. In contrast, when direct evidence is unavailable, the Godwin court noted, and the plaintiff proffers only circumstantial evidence that the employer’s motives were different from its stated motives, we require “specific” and “substantial” evidence of pretext to survive summary judgment. Id. at 1222.
Although we note that the Supreme Court’s recent decision in Desert Palace, Inc. v. Costa, — U.S. -, 123 S.Ct. 2148, 156 L.Ed.2d 84 (U.S.2003), may undermine Godwin to the extent that it implies that direct evidence is more probative than circumstantial evidence, we agree with the Godwin court that Stegall must proffer “specific” and “substantial” evidence of pretext to overcome Marathon’s summary judgment motion. See Manatt, 339 F.3d at 801 (“Because Manatt failed to introduce any direct or specific and substantial circumstantial evidence of pretext, summary judgment for the [employer] must be affirmed.”); Brown v. City of Tucson, 336 F.3d 1181, 1188 (9th Cir.2003); Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270(9th Cir.1996) (“To avoid summary judgment, Bradley must do more than establish a prima facie case and deny the credibility of the [defendant’s] witnesses. She must produce specific, substantial evidence of pretext.”) (internal quotation marks and citations omitted).
Nevertheless, it is important to note that Desert Palace affirmed the value and import of circumstantial evidence in all cases. In the course of affirming a decision of our *1015 circuit sitting en banc that, “[i]n order to obtain an instruction under § 2000e-2(m) [of the 1991 Civil Rights Act], a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that ‘race, color, religion, sex, or national origin was a motivating factor for any employment practice!, ]’ ” 123 S.Ct. at 2155, the Court stressed “the utility of circumstantial evidence in discrimination cases.” Id. at 2154. The Court stated that “[t]he reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: ‘Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.’ ” Id. (quoting Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 508 n. 17, 77 S.Ct. 443,1 L.Ed.2d 493 (1957)).
Moreover, the Court also recognized the critical role that circumstantial evidence plays even in criminal cases: “The adequacy of circumstantial evidence also extends beyond civil cases; we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required.” Id. Finally, the Court noted that “juries are routinely instructed that ‘the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.’ ” Id (quoting 1A K. O’Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04(5th ed.2000)). Accordingly, we refuse to make such a distinction in Stegall’s case.
C. “Single motive” versus “mixed motive” cases
Further complicating the inquiry in a Title VII case is the varying terminology that courts routinely utilize. As we explained in Costa v. Desert Palace, Inc., 299 F.3d 838 (9th Cir.2002) (en banc), courts often categorize cases as either “mixed motive” or “single motive” (sometimes also termed “pretext” cases). The distinction between the two types of cases is as follows:
“In [single-motive] cases, ‘the issue is whether either illegal or legal motives, but not both, were the ‘true’ motives behind the decision.’ In mixed-motive cases, however, there is no one ‘true’ motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate.”
Id. at 856(citing Price Waterhouse v. Hopkins, 490 U.S. 228, 260, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). The significance of the distinction between “single motive” and “mixed motive” is most often seen towards the end of a trial when the district court must instruct the jury.
In mixed motive cases, of which Stegall’s case is arguably one, it does not make sense to ask if the employer’s stated reason for terminating an employee is a pretext for retaliation, when the employer has offered more than one reason for the action that it took. Rather, the relevant inquiry in a “mixed motive” case is distinct from that of a “single motive” or pretext case. We articulated the proper framework in our en banc opinion Costa v. Desert Palace:
[I]n cases in which the evidence could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was “a motivating factor” in the challenged action. If the jury’s answer to this question is in the affirmative, then the employer has violated Title VII.
299 F.3d at 856-57.
Similarly, our opinion in Sischo-Noume-jad v. Merced Community College District summarizes the test as follows:
*1016 The analysis in a case involving mixed motives is somewhat different. The Price Waterhouse [v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)] plurality found the [Texas Dep’t of Community Affairs v.] Burdine, [450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981),] formula unsuitable for mixed motive cases.... Instead, it adopted a simpler approach. Under Price Water-house, the plaintiff must show that it is more likely than not that a protected characteristic “played a motivating part in [the] employment decision.” Once that is done, the employer may escape liability only by proving by way of an affirmative defense that the employment decision would have been the same even if the characteristic had played no role,
934 F.2d 1104, 1110 (9th Cir.1991) (citations omitted).
In the end, the inquiry is straightforward: “[p]ut simply, the plaintiff in any Title VII case may establish a violation through a preponderance of evidence (whether direct or circumstantial) that a protected characteristic played ‘a motivating factor.’ ” Costa, 299 F.3d at 853-54. Even at summary judgment, it is important not to lose sight of the ultimate question that will be before the court, should the plaintiff survive summary judgment. See Costa, 299 F.3d at 857(“The employee’s ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was ‘because of discrimination [or, in this case, retaliation].”). With these general principles of law in mind, we now turn to the merits of Stegall’s retaliation claim. We analyze Stegall’s case as both a pretext case and a mixed motives case, and find that her case survives summary judgment under either theory.
D. Stegall’s retaliation claim
The District Court found, and Marathon concedes, that Stegall established a prima facie case of retaliation. Therefore, we embark upon our analysis of Stegall’s retaliation claim by examining Marathon’s stated reasons for terminating her employment. Marathon has offered two reasons to justify its firing of Stegall. At the time it terminated her, Marathon’s management stated that it was due to changes that were being made to KORD overall. This was consistent with what Marathon told the state Employment Security Department in response to its inquiry about Stegall’s application for benefits. However, after Stegall commenced this lawsuit, Marathon’s managers also stated that she was terminated because she had a negative attitude about her job. These are legitimate, nondiscriminatory reasons for Marathon’s termination of Stegall. Therefore, under McDonnell Douglas, the burden now shifts to Stegall to put forth evidence that Marathon’s reasons are pretextual. Manatt, 339 F.3d at 800.
Stegall offers myriad circumstantial evidence to show that Marathon’s explanations for her termination are pretextual. Under Burdine, Stegall can show pretext in two ways: either “directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer’s proffered explanation is unworthy of credence.” Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. at 256, 101 S.Ct. 1089. Stegall’s circumstantial evidence is sufficient to raise a genuine issue of material fact because it demonstrates that an illegitimate reason more likely motivated Marathon, or was at least a motivating factor in her dismissal. Furthermore, Ste-gall has raised a genuine issue of material fact as to whether Marathon’s second rea *1017 son for firing her, her allegedly negative attitude, is unworthy of credence.
While it is true that Stegall must “produce evidence in addition to that which was sufficient for her prima facie case in order to rebut [Marathones showing!,]” Godwin, 150 F.3d at 1220, it is improper to ignore the evidence in support of Stegall’s prima facie case. See Lowe, 775 F.2d at 1008. Thus, the District Court erred by examining each piece of Stegall’s evidence in isolation, and failing to consider the timing of Stegall’s termination in its pretext analysis.
1. The timing of Stegall’s termination
Stegall argues that the timing of her termination, which occurred nine days after her discrimination complaints, supports her claim that Marathon’s explanations were pretextual. We recently reaffirmed that the timing of adverse employment action can provide strong evidence of retaliation. “Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases.” Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir.2003) (finding sufficient evidence to support retaliation claim where low performance reviews immediately followed plaintiffs complaints). Although we have refused to infer causation from timing alone where the gap between plaintiffs protected activity and the adverse employment action extended to 18 months, Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir.2002), we have found timing highly probative even when the period between the employee’s complaints and adverse action far exceeded the time interval in Stegall’s case. See, e.g., Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987).
Here, a mere nine days lapsed between Stegall’s complaints of discrimination to her new manager, Paul Drake, and 16933 her termination. Although Marathon disputes that Stegall actually informed Drake of her complaints, Stegall asserts that she did so, and we must view the evidence in the light most favorable to her. See Godwin, 150 F.3d at 1220. In addition, both Marathon and Stegall admit that many station employees were aware of Stegall’s complaints, and gender discrimination was one of them. Stegall had made it known throughout the station over the course of her employment with KORD that she resented her lower pay because she believed it was due to her gender. It is clear that Stegall presented credible evidence that she had a discussion with Drake, her new manager, about discriminatory gender pay. Still, setting aside the implausibility of Marathon’s contentions that Drake was unaware of Stegall’s complaints of gender discrimination, we must resolve issues of credibility in favor of the non-moving party. See Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1132 (9th Cir.2003) (“we ‘must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.’ ”) (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 .(1991)).
Marathon attempts to explain the timing of Stegall’s termination by noting that it coincided with the other station wide changes. However, in almost the same breath, Marathon asserts that KORD’s change phase continued a year and a half after Stegall’s termination, when they offered the termination of another employee, Gary Mitchell, to counter Stegall’s contention that she and another female employee were the only people terminated from KORD. Marathon cannot have it both ways.
*1018 The brief period of time that Marathon supervised Stegall before terminating her, merely 24 days, also undermines Marathon’s assertion that it terminated her because she had a negative attitude and was not a team player. Although both sides vigorously dispute this issue, it nevertheless casts doubt on Marathon’s ability to fairly assess Stegall’s performance and attitude accurately, thus strengthening Ste-gall’s contention that illegitimate considerations informed Marathon’s decision.
2. Stegall’s relationship with Cartier
Although timing, standing alone, may be insufficient to raise a genuine issue with respect to pretext, we do not need to rely solely on timing in this case because there exists substantially more. Of significance is Stegall’s evidence of her tumultuous relationship with Cartier and his subsequent role in Stegall’s termination. Although Marathon disputes that Cartier was aware of Stegall’s prior complaints of gender discrimination to Citadel, the record is otherwise. Stegall alleged and offered deposition testimony that not only did she personally tell Cartier of her complaints of gender discrimination, but also that Cartier markedly changed after Ste-gall took two weeks off of work to protest the inequities at KORD.
Upon' her return to work, Cartier’s relations with Stegall took a turn for the worse. Stegall asserts that, although they were friends before she took time off, he refused to speak with her at all when she came back to work. Stegall attempted to discuss her walk out with Cartier, but he refused to hear her out. During an argument shortly after her return to work, he denigrated her based on her gender (calling her a “slut,” “bitch,” and “whore”).
Furthermore, Marathon admits that during discussions amongst its management, which included Cartier, about the station’s re-structuring, Cartier was “adamant” that Stegall be terminated, despite her positive traits.[7] Cartier’s insistence that Stegall and Kristin Crume, another employee who also complained of gender discrimination, be fired was attested to by Drake, Cartier’s co-program director. Moreover, both Van Winkle and Drake assured Stegall shortly before she was terminated that her job was secure, giving rise to the inference that Cartier’s input may have been determinative of Marathon’s decision to fire Stegall.
Stegall was not alone in her observations of Cartier’s animosity towards her. Tamara Peterson, a former KORD employee, testified in her deposition that Cartier told her that he was angered by Stegall’s leave of absence and subsequent return to work.[8] According to Peterson, Cartier called Stegall “a spoiled brat” and resented the fact that she had walked out, yet was nonetheless allowed to return to work. Furthermore, Kristin Crume testified in her deposition that Cartier stated, shortly after learning of Marathon’s purchase of KORD, that he would not be surprised *1019 “when the new company comes in that Lynda [Stegallj’s ass would be blown out of the water.” Although not yet a manager at the time he made the.comment to Crume, the evidence thus far demonstrates that it is probable Cartier decided to do just that once he became Stegall’s manager, because of ill will that he harbored against Stegall due to her complaints. See Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1286 (9th Cir. 2001) (stating that defendant’s “exasperation, lack of sympathy, and even animosity towards [the plaintiff]” provided additional support for the jury’s verdict in favor of the plaintiff).
Add to Cartier’s animosity circumstantial evidence that Drake was also not supportive of Stegall’s facts of gender discrimination,[9] and there can be no other outcome than to allow this case to go to a jury.
3. The station overhaul and Stegall’s “negative attitude”
Marathon asserts that it fired Stegall due to its overhaul of KORD. However, Marathon distorts and exaggerates the extent of the overhaul. While Marathon asserts that all employees were removed, this is simply not true. Most employees either left of their own accord or were reassigned to another position at KORD, or at another one of the Pasco cluster stations. Only Stegall and Crume were expressly terminated. In short, the only employees terminated by KORD were the two women who had complained of gender discrimination.
Moreover, Marathon elaborated on the station overhaul by adding Stegall’s negative attitude as a further reason she was terminated. Although Marathon did not offer this reason until after the start of litigation, it has now gone to great lengths to find evidentiary support that Stegall was a problem employee. However, cutting against Marathon are its assurances to Stegall that her job was secure, shortly before her termination. Although Marathon attempts to explain its assurances to Stegall, by arguing that it did so out of necessity to ensure Stegall’s radio broadcasts would be free of bias, we reiterate that it is not within our province to delve into these factual disputes; rather, we leave them for the trier of fact. We note, however, that this does not explain why Marathon continued to tell the Employment Security Department that Stegall was not at fault for the termination, even after she was no longer on the airwaves.
Finally, although Stegall does not expressly designate her case a “mixed motives” case, both her brief and the record reveal that it can be construed as one. Indeed, a plaintiff need not decide what kind of a case she is bringing at the outset. See Price Waterhouse, 490 U.S. at 247 n. 12, 109 S.Ct. 1775 (“Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a “pretext” case or a “mixed-motives” case from the beginning in the District Court; indeed, we expect that plaintiffs will often allege, in the alternative, that their eases are both.... At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives.”). Accordingly, it is common to have an employer’s reasons for terminating an employee fleshed out during the course of litigation. See, e.g., Lindahl v. Air France, .930 F.2d 1434 (9th Cir.1991) (Noting that “[sjimply because an explanation comes after the beginning of litigation does not make it inherently *1020 incredible[J” but finding on the facts of the case before it that the employer’s differing reasons suggested the later reason was fabricated.).
Since it is uncontroverted that Marathon has offered two reasons for firing Stegall, yet we hold that the record in this case would support a finding that Marathon had illegitimate motives, it is logical to examine the case as one involving “mixed motives.” See Price Waterhouse, 490 U.S. at 244-45, 109 S.Ct. 1775. The timing of Stegall’s termination, the evidence of Stegall’s problems with Cartier, and a probe of the station’s proffered reasons for terminating Stegall reveal that her protected activity was most likely “a motivating factor” in her termination. See Costa, 299 F.3d at 853-54. At the very least, Stegall has raised a triable issue about Marathon’s motivations. Stegall has also made the requisite showing that Marathon’s legitimate reasons for terminating her were pretextual, because she has persuaded us that “a discriminatory reason more likely motivated [Marathon].” Burdine, 450 U.S. at 256, 101 S.Ct. 1089. Thus, Stegall is entitled to a trial on this basis as well.
Analyzed as either a straightforward “pretext” case or a mixed motives case, the record reveals that it is probable that Ste-gall’s protected activity motivated, at least in part, Marathon’s decision to terminate her. Whether or not one accepts one or both of Marathon’s explanations for terminating Stegall, one cannot ignore the evidence, albeit circumstantial, that Cartier, who resented Stegall for complaining of gender discrimination, played a significant role in her termination, thus raising a genuine issue of material fact about whether Stegall’s termination was in fact retaliatory.
Lastly, our decision comes after careful scrutiny of the record and in due regard of the history of discrimination against women in the workplace. Throughout the record, both Marathon and Citadel management repeatedly echoed the all too familiar complaints about assertive, strong women who speak up for themselves: “difficult,” “negative attitude,” “not a team player,” “problematic.” The district courts must reject such sexual stereotypes and learn to identify the oft employed rhetoric that could reveal illegitimate motives.
IV CONCLUSION
The record in this case raises a triable issue as to whether Stegall’s termination was influenced by improper motives on the part of Marathon. The standard is relatively low:
[I]n evaluating whether the defendant’s articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish her prima facie ease. When that evidence, direct or circumstantial, consists of more than the McDonnell Douglas presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason. The existence of this question of material fact will ordinarily preclude the granting of summary judgment.
Sischo-Noumejad, 934 F.2d at 1111 (citations omitted).
Moreover, “[w]e require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a ‘searching inquiry’ — one that is most appropriately conducted by a factfinder, upon a full record.” Id. We have often stated that, because motivations are difficult to ascertain, such an inquiry should be left to the trier of fact: “[A]n employer’s true motive in an employment decision is rarely easy to discern. As we have previously noted, ‘[wjithout a searching inquiry into *1021 these motives, those [acting for impermissible motives] could easily mask their behavior behind a complex web of post hoc rationalizationsId. (internal quotation marks and citations omitted).
Our opinion seeks only to allow Stegall the opportunity to prove Marathon’s motivations for terminating her. Because Ste-gall has marshaled specific and substantial evidence of improper motives on the part of Marathon, we REVERSE the District Court’s grant of summary judgment in favor of Marathon, and REMAND for proceedings consistent with this opinion.

. The five Pasco radio stations that Marathon acquired front Citadel were KORD (a country music station); KEYW (an adult contemporary station); KXRX (a classic rock station); KTHK (a rock station); and KFLD (an AM radio station).

. The only employees who were not initially retained by Marathon at KORD were management-level employees who chose to accept positions with Citadel at other locations in the United States.

. Stegall was employed by Marathon for only 24 days.

. The format was changed from "contemporary[1]' country to "classic/ today's" country. Van Winkle characterized the old format as "way too contemporary," "a teenybopper thing,” and "too hip for the audience.” The new management broadcast more classic country music that included singers such as George Strait

.Kristin Crume was the other employee terminated on the same day as Stegall. She also previously complained of gender discrimination at KORD.

. Although Marathon cites the termination of another employee, Gary Mitchell, that employee was fired nearly a year and a half after Stegall.

. Marathon admitted that Stegall had name recognition and thus, visibility, and performed well at "remotes,” off site station promotion activities.

. Although Marathon objects to Peterson's deposition testimony on the grounds that it is inadmissible hearsay. Such statements fall squarely outside of the definition of hearsay. Federal Rule of Evidence 801 reads, in relevant part, as follows:
"(d) Statements which are not hearsay. A statement is not hearsay if—
(2) Admission by party-opponent. The statement is offered against a party that is (A) the party's own statement, in either an individual or a representative capacity....”
Federal Rules of Evidence 801 (2002).

. Stegall asserted that during her meeting with Drake in which she discussed her complaints of gender discrimination, he was virtually non-responsive.