Patricia S. DAOUD, Plaintiff,

v.

AVAMERE STAFFING, LLC, d/b/a
Avamere Staffing & Home
Care, Defendant.

Civil No. 03–512–MO.

United States District Court,
D. Oregon.

Sept. 21, 2004.

Kerry M.L. Smith, Smith & Fjelstad, Gresham, OR, for Plaintiff.

Kimberlee Collins Morrow, Mark H. Wagner, Hoffman, Hart & Wagner, LLP, Portland, OR, for Defendant.

## OPINION AND ORDER

MOSMAN, District Judge.

In this employment dispute, plaintiff alleges defendant fired her because of her

arthritic knee condition. Because the court finds genuine issues of material fact, the court denies defendant's summary judgment in full, for the reasons outlined below. (Doc. # 18).[1]

## I. BACKGROUND

In this employment dispute, plaintiff Patricia S. Daoud contends that her former employer, Avamere Staffing, discriminated against her because of her disability. She also alleges that defendant violated her family-leave rights established by both state and federal law. In response, defendant argues it terminated plaintiff simply because it had received client complaints about plaintiff. The details of this dispute, as construed in the nonmovant plaintiff's favor, are set forth below.

In March 2001, defendant, which manages a number of retirement homes, hired plaintiff to act as a "personal care aid." At that time, plaintiff informed company personnel she suffers from arthritis in her knees which, in turn, affected her ability to walk. The personnel who hired plaintiff indicated they would work with her regarding her arthritis.

Plaintiff worked for the Courtyard Fountains facility. Despite her arthritis, plaintiff generally worked a split shift, from 7:00 a.m. until noon and from 4:40 p.m. until about 7:30 p.m.

In July 2002, over a year after plaintiff was hired, defendant hired the individuals who ultimately decided to terminate plaintiff, namely, Joanna Kim Cornwell, Patricia Smith, and Denise Bolton. There is no indication these individuals knew about plaintiff's arthritis until September 2002.

Defendant contends that in the summer of 2002 it received "numerous client

---

**1.** The court finds it need not hear oral argument to resolve defendant's motion. See Local Rule 7.1(f).

complaints regarding the care provided" by plaintiff. Plaintiff, however, contends that defendant never told her about any of these alleged complaints until after defendant had fired her. The primary complaint upon which defendant relies involved the following: On or about September 6, 2002, in the context of a billing dispute, the daughter of a couple at Courtyard Fountains complained that she saw the couple's medication scattered all over her room; saw plaintiff on her parents' reclining couch, apparently sleeping; and was generally dissatisfied with plaintiff's care. She also suggested to defendant she would remove her parents if plaintiff continued to care for her parents. While plaintiff concedes that this complaint occurred, she argues no one could pinpoint blame on her, at least to the extent there was scattered medication. She also emphasizes that no one discussed this complaint with her until the day she was terminated.

Plaintiff also notes that before that incident no one working for defendant had otherwise complained about her job performance. While at times plaintiff's supervisors had instructed her on how to perform certain tasks, she was never reprimanded for any mistakes she may have made. She received a merit-based pay raise in April 2002.

There is one other important event, aside from the client complaint, which occurred in September. Sometime in early September plaintiff began advising Michael Davis, the scheduling supervisor, that the arthritis in her knees was beginning to flare up, thus negatively affecting her ability to work her regular full-time hours. She told Mr. Davis she may need to modify her schedule or obtain some other "consideration" to account for her deteriorating medical condition. Although Davis told plaintiff he would pass along her concerns to management, no one ever responded to plaintiff about her medical condition.

On September 9, 2002, after the specific client complaint discussed above and plaintiff's complaint regarding her arthritis, defendant personnel held a meeting to discuss plaintiff's request for a reduced work schedule. Plaintiff was not present at this meeting, nor was she ever told about the meeting. Rhonda Hill, defendant's then-payroll supervisor, who was at the September 9 meeting, states in her affidavit that those present expressly discussed plaintiff's knee condition.

The following day, September 10, plaintiff faxed a document to Mr. Davis again complaining about her arthritic condition; she also specifically asked for shortened work days. In that fax, plaintiff offered to provide additional medical proof should that be necessary. Davis, then, discussed plaintiff's fax and medical condition with Cornwell, Bolton, and Smith.

Not hearing back from Davis, plaintiff faxed another letter to Davis on September 12. This letter also mentioned plaintiff's condition and asked that defendant accommodate her condition. In this September 12 letter, plaintiff notified Davis she would be attempting to obtain medical documentation to support her request for a shortened work schedule. Plaintiff arranged to pick up this documentation on September 13 and told Davis of that arrangement.

Plaintiff worked the morning part of her shift on September 13. At that time, she was still providing care for the couple whose daughter had complained; it had been a week since the daughter's complaint. At the end of her morning shift, Ms. Smith, the company's marketing director, told plaintiff she was terminated. According to defendant, Smith offered to relocate plaintiff to another facility and thus did not actually fire her. Plaintiff, in

contrast, alleges Smith never mentioned relocation but instead unequivocally terminated her.

Despite being fired, plaintiff nevertheless obtained the medical documentation, which she had planned to use to support her request for fewer hours. She obtained a "Clinician's Report of Disability," which would have been effective from September 13, 2002 through December 13, 2002. The report stated plaintiff should not be required to squat or work more than six hours per day. Plaintiff faxed this report to defendant; both Cornwell and Davis saw the report.

After being terminated, plaintiff took a European vacation, which she had planned and paid for before her arthritis began causing her pain. Two days before her vacation, plaintiff took cortisone injections in hopes of alleviating the pain in her knees. Despite the injections, plaintiff testified that, during the vacation, her arthritis limited her movement significantly, as she had to use a cane and walk less than others on the trip.

On or about September 18, 2002, defendant sent plaintiff a letter stating, "We have received several strongly voiced complaints from families and clients regarding your ... performance, therefore we have made the decision to suspend your employment while we investigate the situation." Thus this letter suggests defendant originally suspended, rather than terminated, plaintiff; she contends this is the first time "suspension" was mentioned, as, again, plaintiff had been unequivocally told on September 13 she was terminated. The September 18 letter concluded: "After careful investigation, we have decided your termination with Courtyard is the best solution for all concerned. But we would like to offer the PCA position with Avamere in less demanding environment such as in home care if [you] choose to do so."

Although the September 18 letter references an investigation, plaintiff emphasizes there is no evidence an investigation ever occurred. Moreover, while that letter mentions another, less demanding position, Mr. Davis was specifically instructed not to give plaintiff any future assignments. Additionally, plaintiff takes issue with the letter's suggestion that defendant had removed her from Courtyard because of client complaints. In an attempt to undercut that suggestion, plaintiff, among other evidence, points to Hill's affidavit. Hill avers that, although initially plaintiff's supervisors agreed to permit plaintiff to work a reduced work schedule, they hired a replacement for plaintiff just one day after the September 9 meeting. Hill expressly concludes that a "significant factor" in the decision to terminate plaintiff was her request to work fewer hours because of her arthritic knee condition.

In light of these events, plaintiff filed this lawsuit on July 18, 2003, alleging claims under the Americans with Disabilities Act ("ADA"), the state equivalent to the ADA (ORS 659A.100), the Family Medical Leave Act ("FMLA"), the Oregon Family Leave Act ("OFLA"), ORS 659A.100's unlawful-employment practices section, and common law wrongful discharge.

## II. DISCUSSION

Defendant moves for summary judgment against plaintiff's disability, medical-leave, and wrongful-discharge claims. The court discusses these claims in turn.

### A. ADA Claims

██ The ADA provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). A "qualified individual" is one who can perform the essential functions of

the position at issue with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir.1996). The ADA also defines "disability," as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(©) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "It is an act of discrimination to fail reasonably to accommodate a qualified employee with a disability unless the employer can show that such an accommodation would impose an undue hardship." *Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1252 (9th Cir.2001) (citing 42 U.S.C. § 12112(b)(5)(A)).

In this case, defendant's challenge to plaintiff's ADA claim is based on two arguments: (1) plaintiff lacks a qualifying disability, and (2) there is insufficient evidence that defendant discriminated against plaintiff because of her knee condition.[2]

**(1) Qualified Disability**

■ In arguing that plaintiff has failed to show a qualifying disability, defendant does not argue that plaintiff's degenerative arthritis is not an "impairment." Nor does defendant take issue with plaintiff's proffered "major life activity"—walking. Instead, defendant's argument rests on the following assertion: Plaintiff has failed to present evidence that her condition "substantially limits" her in performing the major life activity of walking. See 42 U.S.C. § 12102(2) (defining disability so as to require a showing impairment at issue "substantially limits" major life activity).

■ Regulations have attempted to give specific meaning to "substantially limits" as that phrase is used in the ADA. It means, among other things:

"unable to perform a major life activity that the average person in the general population can perform"; *or* "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting 29 C.F.R. § 1630.2) (emphasis added). In determining whether a plaintiff's impairment does in fact substantially impair a major life activity, it is appropriate also to take into account any "medication or other measures" which have "corrected" the negative effects otherwise caused by the impairment. *Id.* at 482, 488, 119 S.Ct. 2139 (reasoning that potential airline pilots were not disabled, despite their terrible eyesight, because when they wore their prescription eyeglasses they could see as well as the average person).

■ The "substantially limits" standard is not conducive to bright-line analysis; for instance, the standard can be met at some point short of "utter inabilit[y]," as a qualified disability can be shown "even if the difficulties are not insurmountable." *Bragdon v. Abbott*, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). "Substantially limits," however, "suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d

**2.** The parties agree that plaintiff's state law disability claim, brought pursuant to ORS 659A.112, is governed by the same standards as plaintiff's federal ADA claim. Thus, in deciding plaintiff's ADA claim, the court necessarily also decides the state law claim.

615 (2002) (quoting Webster's Third New Int'l Dictionary 2280 (1976)). But ultimately, whether a plaintiff's impairment substantially limits his or her life activities entails "an individualized" and fact-intensive inquiry. *Id.* at 199, 122 S.Ct. 681. Accordingly, this issue ordinarily is one for the fact-finder to decide. See, e.g., *Doebele v. Sprint/United Mgt. Co.*, 342 F.3d 1117, 1129 (10th Cir.2003) (explaining that whether an impairment substantially limits life activity is "a factual question for the jury," because such an inquiry "involves weighing evidence and assessing credibility of witnesses, tasks historically given to the jury" (citation omitted)).

Defendant first contends plaintiff's condition does not substantially limit her life activities, because she can perform all the activities which were required of her job other than kneeling. Defendant also emphasizes that plaintiff was able to take a European vacation.

Defendant proffers a selective reading of the record. Although plaintiff's doctor's report specifically forbids plaintiff only from "squatting," the report also ordered plaintiff to reduce her workdays from eight to six hours. The reason for the reduction, plaintiff argues, is her arthritis' debilitating effect on her ability to walk and stand. Plaintiff testified that walking requires her to rest frequently and she can stand for only short periods of time. In addition, according to plaintiff, she experiences substantial pain when walking, thus causing her to walk much more slowly than the average person. And although plaintiff took a European vacation which required some walking, that fact, by itself, does not make summary judgment appropriate. At her deposition and in her affidavit, plaintiff explains that the vacation mostly proceeded by bus and did not require a substantial amount of time walking. She also averred that she had to use a cane on the trip, because, when she did

have to walk, she experienced significant pain. The court concludes plaintiff presented sufficient evidence to justify allowing a jury to decide whether her knee condition substantially limited her ability to perform the major life activity of walking.

■ Defendant further responds that plaintiff is not disabled because she has taken cortisone treatments for her knee condition. Defendant correctly points out that a court must consider the effects of any medication, which the plaintiff is taking, on the ability to perform the life activity at issue. See *Sutton*, 527 U.S. at 482, 119 S.Ct. 2139. Contrary to defendant's suggestion otherwise, however, the inquiry does not end simply because a plaintiff has received medical treatment for an impairment. See *id.* at 488, 119 S.Ct. 2139 (explaining that taking corrective measures "does not, by itself, relieve one's disability"). The ultimate inquiry remains whether the employee "is substantially limited in a major life activity." *Id.* Individuals may "take medicine to lessen the symptoms of an impairment so that they can function but nevertheless [may] remain substantially limited." *Id.*

Drawing all inferences in plaintiff's favor, her occasional cortisone treatments do not make summary judgment appropriate. Plaintiff's evidence suggests that she continued to suffer from substantial limitations on her ability to walk, despite her cortisone treatments. Indeed, while defendant emphasizes that plaintiff took cortisone before her European vacation, plaintiff explained that during her vacation she still was unable to walk with the same success of an average person. While plaintiff's cortisone injections ultimately may reduce the severity and duration of her impairment, on this relatively bare record, the court cannot justify granting summary judgment on the basis of her cortisone treatment.

This case is unlike *Sutton,* in which the plaintiffs with their "corrective measures" had 20/20 eyesight and thus were able to "function identically to individuals without a similar impairment." *Sutton,* 527 U.S. at 488, 119 S.Ct. 2139. The out-of-circuit cases cited by defendant also are inapposite to the case at bar. In one of those cases, the plaintiff's ADA claim was based on assertions that without his corrective medicine he "could" or "would" experience substantial limits on his ability to perform a major life activity. See *Orr v. Wal–Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir. 2002) (involving ADA claim by diabetic that if he were to fail "to properly monitor and treat his diabetes, then he *'could'* experience' adverse symptoms which *'would'* ... substantially limit [his] major life activity" (emphasis in original)). And, in the other case cited by defendant, it was undisputed that when the plaintiff took his hypertension medication he was able to "function[ ] normally and ha[d] no problems whatsoever." *Hein v. All Am. Plywood Co.,* 232 F.3d 482, 487 (6th Cir.2000). In contrast, the record in the case at bar, read in favor of the nonmovant plaintiff, suggests that her occasional cortisone treatments help alleviate her symptoms but do not remove the substantial limits on her ability to walk. This is precisely the type of issue for the jury to decide.

In sum, defendant ignores evidence of plaintiff's difficulty walking and, in fact, does not attempt to rebut that evidence. On this record, keeping in mind the fact-intensive nature of the inquiry, see *Doe-*

*bele,* 342 F.3d at 1129, the court concludes there are material fact issues regarding whether plaintiff is "[s]ignificantly restricted as to the condition, manner or duration" in her performance of the major life activity of walking. 29 C.F.R. § 1630.2(j).[3]

### (2) Defendant's Motives

 Defendant's next argument is that it did not ask plaintiff to leave Courtyard Fountains *because of* her arthritic knee condition. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability...."). Rather, according to defendant, plaintiff was asked to leave simply because there had been complaints from clients about plaintiff's care of Courtyard residents.

The court rejects defendant's argument, as plaintiff has come forward with probative evidence creating fact issues on why defendant asked plaintiff to leave the facility. As an initial point, defendant argues that it never terminated plaintiff's employment, but only removed her from Courtyard Fountains with the intention of placing her in a new position elsewhere. The record, read in plaintiff's favor, does not support that contention. Plaintiff testified that on September 13, 2002, defendant's marketing director, Ms. Smith, unequivocally told plaintiff she was terminated. Smith never mentioned the possibility of reassigning plaintiff. In addition, although a few days later defendant sent a letter to plaintiff suggesting that defendant may use her at another location, defendant told Mr. Davis, defendant's staffing specialist,

---

**3.** Plaintiff also alleged that her impairment substantially limits her ability to perform the major life activity of "working." The court need not at this time determine this issue, because there are fact issues regarding her ability to walk, which defendant does not dispute qualifies as a major life activity. See 29 C.F.R. § 1630.2(i) (providing that major life activities means "functions such as ... walk-

ing"). The Supreme Court, however, has been skeptical of characterizing "working" as a major life activity. See, e.g., *Toyota Motor Mfg.,* 534 U.S. at 200, 122 S.Ct. 681 ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today.").

not to pursue actively any new positions for plaintiff. Thus, on this record, a jury could find that defendant in fact terminated plaintiff's employment.

A jury could also find that defendant made the termination decision because of plaintiff's arthritic knees. Defendant argues it terminated plaintiff because clients or their families had complained about plaintiff's care. Although this certainly would be a legitimate reason for terminating plaintiff, the evidence does not conclusively establish this allegation. First, no one ever told plaintiff about any of the alleged complaints or warned plaintiff about her job performance. Defendant told plaintiff about the daughter's complaint regarding her parents only on or about September 13, 2002, a week after the daughter first complained but immediately after plaintiff had asked for an accommodation. In the week between the daughter's complaint and plaintiff's termination, defendant allowed plaintiff to continue to care for the couple. Of course, nothing in the law required defendant to give plaintiff a warning or tell plaintiff about the alleged client complaints; not doing so, however, supports a reasonable inference the complaints did not trigger plaintiff's termination.

Defendant also relies on the fact plaintiff originally told its personnel about her arthritis when she was hired. Thus, according to defendant, it does not make sense to say there was discrimination when defendant hired plaintiff knowing about her condition. This argument, however, is not persuasive. The individuals responsible for hiring plaintiff no longer were working for defendant when plaintiff was fired. There is no indication that those who fired plaintiff even knew about her arthritis until September when she was terminated.

Furthermore, Ms. Hill, defendant's payroll supervisor, averred in her affidavit that plaintiff's request for accommodation was a significant factor in the decision to terminate her. Ms. Hill further opined that the termination was not based on client complaints about plaintiff. When Ms. Hill expressed concerns about defendant's decision to terminate plaintiff, Ms. Cornwell responded that "people sued her all of the time and she did not care if she was sued."

Defendant attacks Hill's affidavit as "unreliable"; such an attack, however, should be saved for trial. Drawing inferences in plaintiff's favor, Hill was privy to the conversations discussing plaintiff's knee condition and request for accommodation, thus giving Hill an underlying foundation for her opinions regarding why plaintiff was fired.[4]

In summary, drawing all inferences in plaintiff's favor, as the court must, there are material issues of fact regarding whether defendant fired plaintiff because of her qualified disability.[5]

---

**4.** The court notes that, even assuming the Hill affidavit should not be considered, plaintiff's other evidence casting doubt on defendant's proffered reason for firing her is sufficient to defeat summary judgment.

**5.** The court notes that neither side discusses whether application of a "mixed motive" analysis is appropriate in resolving plaintiff's disability claims. See generally *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1067 (9th Cir.2004) (distinguishing "mixed motive" cases from "single motive" cases). Some courts have recognized the applicability of mixed-motive analysis to ADA cases. See, e.g., *Dunlap v. Association of Bay Area Gov'ts*, 996 F.Supp. 962, 966 (N.D.Cal.1998). Because the parties are silent on the issue, however, the court will not at this time decide whether plaintiff's disability claims may be considered under a mixed-motive framework.

Moreover, the "significance of 'single motive' and 'mixed motive' is most often seen towards the end of a trial when the district court must instruct the jury." *Stegall*, 350 F.3d at 1067. Indeed, in the case at bar,

### (3) Perceived Disability & Retaliation

Aside from basing her ADA claim on her alleged actual disability, plaintiff also asserted two additional ADA theories: (a) defendant *retaliated* against her because she sought accommodation, and (b) defendant terminated her because defendant's personnel *perceived* that plaintiff was disabled. These theories are potentially significant because neither requires the existence of an actual qualified disability. Thus, even assuming that plaintiff had insufficient evidence of an actual qualified disability, she still would get a trial, for the reasons briefly discussed below.

■ *Perceived Disability:* As stated, the ADA's definition of "disability" includes employees "regarded as having" an actionable impairment. 42 U.S.C. § 12102(2). Under this theory, a plaintiff must show that a covered entity "entertain[ed] misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139.

In this case, defendant does not move for summary judgment against the "Misperceptions" prong, but argues only that there is no evidence it fired plaintiff because of her knee condition. For the reasons discussed *supra*, the court rejects that contention.

*Retaliation:* The ADA's retaliation provision provides:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). The Ninth Circuit applies the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-shifting framework in analyzing ADA retaliation claims. See *Brown v. City of Tucson*, 336 F.3d 1181, 1186 (9th Cir.2003). Thus plaintiff must first establish a prima facie case by showing the following: " '(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two.' " *Id.* at 1187 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000)). If the defendant sets forth a legitimate reason for the adverse employment action, the plaintiff then carries the burden of showing pretext. *Id.* at 1187–88. Nothing in this framework requires the plaintiff to show an actual disability; he need only show he "possessed a 'good faith, reasonable belief that the underlying challenged actions of the employer violated [the ADA].' " *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998)).

In this case, defendant does not dispute that plaintiff: engaged in a protected activity (by complaining to defendant about her disability and requesting accommodation), suffered an adverse employment action, or reasonably believed defendant was violating the ADA. Defendant's only argument is aimed at causation, again arguing that it terminated plaintiff because of client complaints about her job performance. As discussed above, there is sufficient evidence creating fact issues about whether "a discriminatory reason more likely motivated the employer or ... the

however the causation issue is precisely framed, plaintiff has sufficient evidence to defeat summary judgment. Thus, even had

the issue been raised, there is no compelling reason to decide at this time whether a mixed-motive analysis is proper.

employer's proffered explanation is unworthy of credence." See *City of Tucson*, 336 F.3d at 1188.

In addition, defendant terminated plaintiff less than three days after plaintiff requested accommodation for her knee condition. Although temporal proximity might not alone be sufficient to defeat summary judgment, the timing of the termination here is highly probative, especially when coupled with the other evidence undermining defendant's proffered reason for the termination. See, e.g., *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1069–70 (9th Cir.2004) (finding a nine-day period between protected activity and termination "highly probative" of retaliatory intent).

In sum, the court finds too many fact issues to justify granting summary judgment against plaintiff's ADA claims.

### B. Medical–Leave Claims

■ The FMLA ensures job security for employees who must be absent from work because of their own illnesses or need to care for ill family members. See 29 U.S.C. § 2612.[6] It entitles covered employees to a total of up to twelve weeks of leave each year to care for their own or family members' serious health conditions. *Id.* The Act makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by FMLA. *Id.* § 2615(a).

■ In order to obtain leave under FMLA, a qualified employee must give the employer notice of his or her intention to take leave. *Id.* § 2612; 29 C.F.R. § 825.303. The required notice, however, need not be detailed; it need only notify the employer of circumstances suggesting "that the FMLA might apply." *Bachelder v. America West Airlines, Inc.*, 259 F.3d

1112, 1130 (9th Cir.2001). In fact, the employee " 'need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed [for a qualifying reason].' " *Id.* (quoting 29 C.F.R. § 825.302). And, if "the employer lacks sufficient information to determine whether an employee's leave (including leave taken in the form of a reduced schedule) qualifies under the FMLA, the employer should inquire further in order to ascertain whether the FMLA applies." *Bailey v. Southwest Gas Co.*, 275 F.3d 1181, 1185 (9th Cir.2001) (citing 29 C.F.R. § 825.208).

In this case, defendant argues that there is insufficient evidence it terminated plaintiff because of her intention to take leave for a serious medical condition. While defendant does not contend that plaintiff's arthritis fails to qualify as a "serious health condition," defendant argues it removed plaintiff from Courtyard Fountains only because of the alleged client complaints. Defendant additionally argues that plaintiff failed to give adequate notice of her intention to take leave. Specifically, according to defendant, the only leave plaintiff asked for was in connection with her European vacation. As briefly discussed below, these arguments do not justify granting summary judgment.

First, as discussed in the context of plaintiff's ADA claims, there are genuine issues of fact regarding whether defendant terminated plaintiff because of her arthritic knees. Reading the record in plaintiff's favor, defendant unequivocally terminated plaintiff on September 13, 2002, and did not offer plaintiff any modified-schedule opportunities. In addition, as already discussed, defendant never warned plaintiff about her job performance or informed her of any alleged client complaints until the

---

6. The parties treat OFLA and FMLA the same. Thus, for purposes of this order, the FMLA discussion applies equally to plaintiff's OFLA claim.

day it terminated her—which occurred almost immediately after she requested a reduced work schedule. Moreover, Ms. Hill, who was present at a meeting at which personnel discussed plaintiff's knee condition, concluded that plaintiff was not terminated because of any client complaints.

The court secondly rejects defendant's argument that plaintiff failed to give notice of her intention to take leave. As an initial matter, the fact plaintiff never expressly asked for "FMLA leave" does not resolve the issue. See *Bachelder*, 259 F.3d at 1130–31. However, plaintiff's request for time off for a European vacation plainly did not give defendant notice of any intention to take leave *for a qualified reason*. But plaintiff does not rely on her request for vacation time to support her medical-leave claims. Rather, plaintiff argues that she gave defendant notice of her need to reduce her hours as a result of her knee condition, thus putting defendant on notice of her need for qualified leave.

█ Defendant does not dispute that plaintiff asked for a reduced schedule so she could rest her knees. Plaintiff unequivocally informed Davis that her arthritis was flaring up and asked for shortened workdays. She also told Davis she would obtain confirmation from her doctor. Defendant also does not dispute plaintiff's premise that a request for a reduced-work schedule may qualify as FMLA leave. Indeed the Ninth Circuit has expressly held that an employee's request for a reduced work schedule as a result of a serious health condition qualifies as medical leave under FMLA. See *Rowe v. Laidlaw Transit, Inc.*, 244 F.3d 1115, 1117–19 (9th Cir. 2001). If defendant had any doubts about whether plaintiff's request for "leave taken in the form of a reduced schedule" would qualify under FMLA, it was incumbent on defendant to "inquire further." *Bailey*, 275 F.3d at 1185. In short, the court finds there are material fact issues regarding whether plaintiff gave sufficient notice of an intention to take FMLA leave and thus denies summary judgment as to plaintiff's medical-leave claims.

## C. Wrongful–Discharge Claim

█ There is no dispute plaintiff was an at-will employee. At-will employees generally may be fired for any reason, rational or irrational. The wrongful-discharge doctrine provides an exception; under that doctrine, at-will employees may bring common law claims against employers who terminated the employees for certain "socially undesirable motive[s]." *Holien v. Sears, Roebuck & Co.*, 298 Or. 76, 83–84, 689 P.2d 1292 (1984). The Oregon Supreme Court, for example, has recognized wrongful-discharge claims where " 'plaintiffs pursued private statutory rights and were fired for their pursuit.' " *Id.* at 86, 689 P.2d 1292 (quoting *Delaney v. Taco Time Int'l*, 297 Or. 10, 15–16, 681 P.2d 114 (1984)). The court thus has allowed an employee to bring a wrongful-discharge claim although she had a Title VII and state statutory claim for defendant's alleged sex discrimination. See *id.* at 86, 97–100, 689 P.2d 1292.

█ And, although there should be no wrongful-discharge claim "where an adequate existing remedy protects the interests of society," *Delaney*, 297 Or. at 16, 681 P.2d 114, the fact an employment statute specifically delineates available remedies, such as back pay, will not itself preclude recognition of a wrongful-discharge claim and thus recovery of traditional tort damages. See *Holien*, 298 Or. at 91, 97, 689 P.2d 1292. For instance, statutory remedies, unlike tort damages, may not compensate "the plaintiff for such personal injuries as anguish, physical symptoms of stress, a sense of degradation, and the cost of psychiatric care." *Id.* at 97, 689 P.2d

1292. "Legal as well as equitable remedies are needed to make the plaintiff whole." *Id.*

In challenging plaintiff's wrongful-discharge claim, defendant again contends that it did not actually discharge plaintiff. Defendant further argues that plaintiff cannot satisfy the "statutory rights" exception to the at-will doctrine, because she has insufficient evidence to support her underlying ADA and FMLA claims. Third, defendant argues that, in any event, those statutes provide "adequate statutory remedies," thus making recognition of a wrongful-discharge claim inappropriate.

The court rejects defendant's arguments. Its first two arguments—that plaintiff was not fired and her statutory claims are not viable—fail for reasons already discussed above. The court also rejects defendant's argument there are sufficient statutory remedies. First, defendant fails to elaborate on this point, as it does not at all discuss the remedies available under the statutes invoked by plaintiff. Absent such elaboration from defendant, the court will not grant summary judgment on that basis. However, as just one example of the possible inadequacy of the statutory remedies, the court notes that plaintiff cannot recover non-economic or emotional-distress damages under FMLA. See 29 U.S.C. § 2617; see also *Washington v. Fort James Operating Co.,* 110 F.Supp.2d 1325, 1334 (D.Or.2000) ("In this case, [claimant's] remedies under the FMLA may be inadequate because wrongfully discharged employees cannot seek damages for emotional distress damages under that statute."); *Holien,* 298 Or. at 97, 689 P.2d 1292 (finding harassment statutes' remedies inadequate because they did not account for injuries such as "anguish"). Notably, the Oregon Court of Appeals recently held that an employee may bring a wrongful-discharge claim where the employer violated OFLA in terminating the employee. See *Yeager v. Providence Health Sys.,* 195 Or.App. 134, 96 P.3d 862, 866–67 (2004). In short, summary judgment is inappropriate on plaintiff's wrongful-discharge claim.

## III. CONCLUSION

For the reasons discussed above, the court DENIES defendant's motion for summary judgment (doc # 18). Defendant offers a selective reading of the record; construing the facts in plaintiff's favor, as the court must, there are too many issues of material fact presented by this record to grant judgment as a matter of law.

IT IS SO ORDERED.