**DISSENT and Opinion Filed June 27, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-20-00376-CV

## THE UNIVERSITY OF TEXAS AT DALLAS, Appellant
## V.
## RICHARD J. ADDANTE, PH.D., Appellee

**On Appeal from the County Court at Law No. 1**
**Dallas County, Texas**
**Trial Court Cause No. CC-17-03714-A**

# DISSENTING OPINION FROM DENIAL OF
# EN BANC RECONSIDERATION
Opinion by Justice Reichek

This appeal concerns a former UTD employee's allegations that he was terminated from his position as a non-tenured senior lecturer in retaliation for reporting and/or opposing both gender discrimination and sexual harassment. The trial court denied UTD's plea to the jurisdiction, but a panel of this Court reversed, with one justice dissenting, and dismissed the suit brought by Richard J. Addante, Ph.D. Addante sought en banc review, which a majority of this Court voted to deny. Because I disagree with that vote as it relates to Addante's claim of retaliation for reporting gender discrimination, I dissent. The majority opinion sets

forth the background facts in this case at length, and I will not repeat those facts other than to note the following.

In August 2015, UTD's Acting Provost Inga Musselman sent Addante a reappointment letter for the 2015-2016 academic year that reflected a $50,000 annual salary. In response, on August 3, Addante sent Musselman an email acknowledging the offer of employment but expressing concern about a "considerable pay gap" between his salary and that of a fellow senior lecturer who was female. Addante made clear in his email that he believed this was an instance of "gender discrimination":

> I wanted to be sure that UT Dallas remained compliant with Title IX employment law, and did not inadvertently become non-compliant with federal law prohibiting gender discrimination in pay for its Senior Lecturers.
> . . .
> According to the EEOC, "the Equal Pay Act requires that men and women in the same workplace be given equal pay for equal work. The jobs need not be identical, but they must be substantially equal." As far as I am aware, the current pay discrepancy is the type of discrepancy forbidden by Title IX statutes, and I'd like to help UT Dallas remain compliant.
>
> . . .
> It is my hope that as we begin this new academic year's successes, that we can do so as compliant with federal Title IX policies of equal pay for equal work, and that the compensation level may be adjusted accordingly, so that it is commensurate with experience and on par with other comparable colleagues.

Musselman, who had only recently assumed her role and had no knowledge of how Addante's pay rate was determined, forwarded Addante's email to UTD

Interim President Dr. Hobson Wildenthal. Thirty-two days later, on September 4,

Wildenthal responded to Addante's email as follows:

> You recently communicated with Acting Provost Musselman raising issues about your FY 16 compensation. Since Dr. Musselman had no role in setting your compensation, which occurred under my management, I am answering your letter.
>
> In reviewing the evaluations of classroom instruction last year, I noted the unsatisfactory results for your teaching performance. I inquired as to the genesis of your employment and was informed that it was a temporary expedient, provided more or less on compassionate grounds in order for you to have a better chance of obtaining regular employment subsequent to the completion of your post-doctoral appointment.
>
> I expressed my lack of support for this sort of process for providing instruction for our students, in particular given the unsatisfactory results, and was given to understand that your employment would not be renewed. As is normal for individuals programmed not to be employed for the coming year, I did not allocate a salary adjustment for your name.
>
> The fact that you appear to again be employed for FY 16 I regard as an administrative oversight or failure. You should use this fortuitous (for you) accident of an additional year of UT Dallas employment to good advantage and succeed in finding regular employment elsewhere after May 31, 2016.

UTD has taken the position that this communication reflected its decision to

terminate Addante at the end of the 2015-2016 academic year and, as reflected in his

letter, that the decision was made by Wildenthal.

In response to UTD's appellate brief, Addante argued that his email to Musselman constituted protected conduct, and that Wildenthal retaliated against him in response to this protected conduct.[1] UTD argued in reply, and a majority of the panel agreed, that Addante failed to raise this issue before the trial court. The majority reasoned:

> Regarding Addante's argument that Addante's Letter to Musselman was a protected activity, the record shows that Addante failed to raise that argument before the trial court. Addante's responses to UTD's plea to the jurisdiction neither attached, specifically identified, or expressly presented Addante's Letter to Musselman as a protected activity. For the first time on appeal, Addante asserts this letter was a protected activity. However, as this argument was not presented to or adjudicated by the trial court, we cannot consider this new argument. *See* Tex. R. App. 33.1; *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993).

In her dissent to the majority opinion, Justice Partida-Kipness thoroughly rebuts this rationale. *See Univ. of Tex. at Dallas v. Addante*, No. 05-20-00376-CV, 2021 WL 4771464, at *2–3 (Tex. App.—Dallas Sep. 8, 2021) (dissenting opinion). For the same reasons as set forth in the dissent, I would conclude that Addante identified the letter as a protected activity in the proceedings below and that he did not waive this issue for review. *Id.* In particular, I agree that Addante raised the issue in his original petition, as well as in his multiple responses to UTD's plea to the jurisdiction, which was sufficient to put the trial court on notice. *See id.* at *3.

---

[1] Addante exhausted his administrative remedies with respect to this allegation by filing a timely EEOC charge within 180 days of Wildenthal's letter wherein he described both his email to Musselman and Wildenthal's response to the email.

–4–

Having determined that this issue was raised by the pleadings, asserted in response to the plea to the jurisdiction, and considered by the trial court, I would reach the question of whether Addante raised a genuine issue of material fact on the matters of protected activity and unlawful retaliation.

The Texas Commission on Human Rights Act is codified at Chapter 21 of the Texas Labor Code. Among other things, the TCHRA prohibits an employer from discriminating against an individual in connection with compensation on the basis of sex. TEX. LAB. CODE § 21.051. The TCHRA also prohibits an employer from retaliating against an employee who opposes such discrimination. TEX. LAB. CODE § 21.055.

To establish a prima facie retaliation case under the TCHRA, a plaintiff must show (1) he engaged in a protected activity, (2) the employer took an adverse employment action against him, and (3) a causal connection between the protected activity and the adverse employment action. *San Antonio Water Sys. v. Nichola*s, 461 S.W.3d 131, 137 (Tex. 2015). The employee need not establish the protected activity was the sole cause of the employment action. *City of Dallas v. Siaw-Afriyie*, No. 05-19-00244-CV, 2020 WL 5834335, at *6 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op). All that is required is evidence from which a factfinder may infer that retaliation motivated the adverse employment action in whole or in part. *Id*.

Addante asserts that his email was protected conduct under § 21.055. Addante's burden in this regard is not onerous, and he must show only that his email

alerted UTD of his reasonable belief that unlawful discrimination was at issue. *Alamo Heights Indep. Sch. Dist. v. Clark,* 544 S.W.3d 755, 786 (Tex. 2018) (citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 586 (Tex. 2017)). EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915.004, August 25, 2016, provides: "The opposition clause [of Title VII] applies if an individual explicitly or implicitly communicates his or her belief that the matter complained of is, or could become, harassment or other discrimination. The communication itself may be informal and need not include the words 'harassment,' 'discrimination,' or any other legal terminology, as long as circumstances show the individual is conveying opposition or resistance to a perceived potential EEO violation."

Even though Addante need not use "magic words" like "discrimination," he did so and more, warning UTD that it was at risk of becoming "non-compliant with federal law prohibiting 'gender-discrimination' in pay among its senior lecturers," citing EEOC guidance interpreting the Equal Pay Act to require "equal pay for equal work," describing his perception that "the current pay discrepancy is the type of discrepancy forbidden by Title IX statutes," identifying who he believed to be a relevant female comparator, and expressing his goal of ensuring that UTD begin the new academic year "compliant with federal Title IX policies of equal pay for equal work."

For its part, UTD cited only *Alamo Heights* for the proposition that the email was not protected. UTD gave no explanation as to why *Alamo Heights* is instructive,

–6–

reciting only its observation that "complaining only of 'harassment,' 'hostile environment,' 'discrimination,' or 'bullying' is not enough." *Id*. at 786. But UTD failed to include the next sentence in *Alamo Heights*: "There must be some indication of gender motivation, such as sexual propositioning or other behavior signifying Clark's belief that her gender motivated the behavior." *Id*. at 787. Addante's email meets this standard, as it repeatedly draws a causal connection between his gender and his pay.

Wildenthal's September 4 letter advising Addante that his employment would not be renewed at the end of the year was in response to, and only one month after, the email Addante asserts as protected conduct. This was made clear in the opening paragraph: "You recently communicated with Acting Provost Musselman raising issues about your FY16 compensation. Since Dr. Musselman had no role in setting your compensation, which occurred under my management, I am answering your letter." After criticizing Addante's job performance, Wildenthal concluded with the following: "The fact that you appear to again be an employee for FY16 I regard as an administrative oversight or failure. You should use this fortuitous (for you) accident of an additional year of UT Dallas employment to good advantage and succeed in finding regular employment elsewhere after May 31, 2016." Close timing between an employee's protected activity and an adverse action may provide the "causal connection" required to make out a prima facie case of retaliation. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). A time lapse of up to four

–7–

months has been found sufficient to satisfy the causal connection. *Id.*; *see also Alamo Heights*, 544 S.W.3d at 790 (in plea to jurisdiction, temporal proximity of two or three weeks would raise fact issue on prima facie causation). Based on the record, I conclude the parties' evidence created a fact issue on whether UTD engaged in retaliation by not renewing his employment at the end of the 2015-2016 academic year.

UTD argues that even if the evidence created a fact issue on the prima facie case of retaliation, Addante failed to satisfy his burden to then provide evidence that UTD's asserted non-retaliatory reasons for his termination were not credible, and were instead a pretext for unlawful retaliation.

In support, UTD argues that it made the decision to terminate Addante at the end of the 2015-2016 academic year not because of his protected conduct, but because of the "articulated reasons for his non-reappointment" as set forth in Wildenthal's letter; specifically, (1) Addante's poor course and instructor scores in his student evaluations for the Fall 2014 semester; (2) Wildenthal's lack of support for hiring a former UTD post-doctoral student who could not find a tenure track position at another university; and (3) Wildenthal's understanding that the dean would not reappoint Addante for the 2015-2016 academic year. Relying on a specific excerpt from Addante's deposition, UTD claims that Addante does not dispute that these were the articulated reasons for his non-reappointment. However, the referenced deposition testimony addresses only Addante's student evaluations.

Assuming for the sake of argument that Wildenthal's lack of support for *hiring* Addante as a senior lecturer can serve as a legitimate non-retaliatory reason for *firing* Addante a jury may choose to disbelieve this purported reason for his termination, especially since Wildenthal approved Addante's hire as senior lecturer. Also, there is no evidence that Wildenthal's understanding that the dean would not reappoint Addante for the 2015-2016 academic year was a reason for UTD's decision not to renew Addante's contract for 2016-2017. A jury could reasonably conclude that Wildenthal's letter was merely explaining why Addante did not receive a merit raise that academic year, rather than giving another reason for his termination.

UTD proffered affidavit testimony from Wildenthal in support of its plea to the jurisdiction. Wildenthal claimed that he reviewed Addante's Fall 2014 course evaluations in January 2015 and instructed Dean Bert Moore not to extend Addante a teaching contract for 2015-2016 based on those evaluations. UTD offers no evidence to support this conversation other than Wildenthal's affidavit testimony, which a jury is free to disbelieve or deem irrelevant since Addante was ultimately offered another teaching contract for 2015-2016, and, in this lawsuit, Addante challenges UTD's decision to not renew his contract for 2016-2017.

Addante also adduced evidence that his course evaluations were not a valid indicator of job performance, he was a good lecturer, and UTD knew this. In the alternative, assuming UTD considered his Fall 2014 course evaluations a valid indicator of job performance, Addante also offered evidence to show his teaching

performance improved after that. Interim Dean Dr. James Bartlett, who made the decision to employ Addante as a Senior Lecturer, explained that Addante's 2014-2015 teaching load was difficult and perhaps unrealistic, but that Addante met the challenge. In describing Addante's teaching load, Bartlett stated that "[t]his was obviously a quite challenging teaching regimen, far more difficult than anything we would put an entering tenure track Assistant Professor through. Nonetheless, [Addante] did very well, not only in teaching the courses themselves, but inspiring a number of the undergraduate students to do research in an EEG lab we set up for this purpose." Bartlett acknowledged that while there were some "bumps along the way" and some students did not enjoy Addante's Behavioral Neuroscience class, this was "not an unusual situation with a new preparation in a challenging course [and] the important point [was] that [Addante] made some adjustments to his teaching style and rectified the problem." In fact, both Bartlett and the director of the undergraduate neuroscience program sat in on several of Addante's classes when he offered it for a second time and thought he did well. This is some evidence that UTD's assertion that Addante's termination was a result of his poor job performance was a pretext for retaliation. *See McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000) (employer relied on performance problems that were stale by more than a year and a half without regard to his notably improved performance since); *Bouard v. Ramtron Int'l Corp.*, No. 12-cv-00494-WYD-MJW, 2013 WL 5445846, at *6 (D. Colo. Sept. 27, 2013) (termination took place months

after alleged misconduct but only 25 days after protected activity); *Jeffries v. FEMA*, No. PX-19-01816, 2020 WL 4262270, at \*8 (D. Md. July 24, 2020) (mem. op.) ("At that time, Jeffries had already been counseled for her misuse of the credit card, and so a reasonable finder of fact could conclude that issue had been resolved, only to be resurrected in response to Jeffries' formal discrimination complaint."); *Daoud v. Avamere Staffing, LLC*, 336 F.Supp.2d 1129, 1137 (D. Or. 2004) (termination occurred immediately after request for accommodation; although employer claimed it terminated plaintiff because of customer complaints, those had occurred several days earlier and employer had taken no action in interim); *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) ("If the disputed facts are resolved in Donley's favor, a reasonable jury could interpret the suspicious timing as evidence (a) that one or both decision-makers initially found Donley's actions … to be tolerable, and (b) that they decided only later, after she had filed her internal complaint, to use that incident as a pretext to fire her for retaliatory reasons."); *Cruz v. R2Sonic, LLC*, 405 F.Supp.3d 676, 693-4 (W.D. Tex. 2019) (evidence of pretext where employer waited until after employee became disabled to discipline employee for purported performance problems that predated disability); *Quillen v. Touchstone Med. Imaging LLC*, 15 F.Supp.3d 774, 783 (M.D. Tenn. 2014) (after manager exposed discriminatory act against employee with disability, manager was disciplined for something that happened months before).

Because I conclude Addante pleaded a claim for gender discrimination retaliation, and further supported that claim with sufficient evidence to raise a genuine issue of material fact, I dissent from the Court's decision to deny en banc consideration.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE


Joined by: Molberg, Partida-Kipness, Nowell, Carlyle, and Garcia, J.J.

200376F.P05